George Marshall JONES, Appellant,

v.

UNITED STATES, Appellee.

James E. BUTLER, Appellant,

v.

UNITED STATES, Appellee.

Nos. 90–CF–947, 90–CF–983.

District of Columbia Court of Appeals.

Argued April 14, 1992.
Decided May 13, 1993.

William G. Dansie, appointed by this court, for appellant Jones.

Shirlimarie McAroy–Gray, Public Defender Service, with whom James Klein and Page Kennedy, Public Defender Service, were on the brief, for appellant Butler.

Albert A. Herring, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Thomas C. Black and N. Paul Patterson, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY and SULLIVAN, Associate Judges.

SULLIVAN, Associate Judge:

Appellants, James E. Butler and George Marshall Jones, were each charged in indictments with assault with intent to kill while armed in violation of D.C.Code §§ 22–501, –3202 (1989). A jury convicted Butler of the indicted offense and convicted Jones of the lesser-included offense of assault with a dangerous weapon in violation of D.C.Code § 22–502 (1989). In these consolidated appeals, appellants raise two principal issues. First, we consider whether the trial court abused its discretion by admitting excessive evidence and allowing argument by government counsel concerning the nature of appellants' homosexual relationship with each other and appellant Butler's effeminate characteristics. We also consider whether the evidence was sufficient to sustain appellant Jones's conviction for assault with a dangerous weapon under an aiding and abetting theory.

■ We hold that the trial court abused its discretion by allowing excessive evidence of appellants' homosexual relationship and appellant Butler's effeminate characteristics. We also hold that the evidence as to Jones was insufficient to sustain a conviction for assault with a danger-

ous weapon under an aiding and abetting theory. Accordingly, we reverse Butler's conviction and remand for a new trial. We also reverse Jones's conviction and remand for the entry of a judgment of acquittal, since reversal of his conviction on the additional ground of insufficient evidence is a bar to a new trial.[1] *See Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978).

## I.

The government's evidence[2] showed that Christine Filosa, a volunteer kindergarten teacher, was stabbed in the chest with a serrated-edged steak knife near the intersection of Park Road and Sixteenth Street, Northwest, at approximately 1:45 p.m. on May 9, 1988. The stabbing occurred while Ms. Filosa was leading a group of twenty-two kindergartners from the Sacred Heart Parish School to a nearby playground located a block and a half away on Sixteenth Street and adjacent to the Sacred Heart Church. At the time of the stabbing, Ms. Filosa was holding the hands of two children in the front of the group. She was accompanied by her aide, Cynthia Barnes, who was at the rear of the double line of children.

As the group approached the intersection, Ms. Filosa observed a tall man, later identified as Jones, and a short man, later identified as Butler, standing about a foot apart on the corner on the south side of Park Road. Ms. Filosa observed that Butler was looking up and talking animatedly to Jones, who was looking down and listening. She also observed that the two men were looking in her direction.

When Ms. Filosa got close to the corner on the north side of Park Road, she noticed Jones walking toward her from her right side in a slouched, nonchalant manner. Ms. Filosa stepped back to clear a path for Jones to pass in front of her. Jones neither spoke nor gestured as he brushed several inches in front of her without touching her. Ms. Filosa testified that she wasn't frightened of Jones, but that she experienced "a twinge of concern" when he "came so close to [her]" and "almost a sense of relief when he continued [on his way up Sixteenth Street]." She testified that she "didn't bother to continue looking at him" once he had passed her.

After Jones had passed Ms. Filosa, she turned around to her left to check on the children. While she was still turned around, she felt a hard blow to her chest. She testified on direct examination that she turned back "instinctively" and saw Butler's face with a "very evil, hateful ... satisfied expression" on it about six inches from her. Without uttering a word or making any overt gesture, Butler pulled the knife out of her chest, tucked it in his jacket, and walked away alone in a "very bouncy ... feminine" manner[3] in the same direction as Jones had walked on Sixteenth Street.

By then, Jones had turned around and was coming back down Sixteenth Street toward Butler. One of the children testified that she saw Butler stop and drop the knife in a mailbox, and a police officer testified that he later recovered the knife from the mailbox. Ms. Barnes testified that she watched the two men "join up" and walk away together and that she observed that both were "laughing and talking."

1. In view of our reversal of appellants' convictions on other grounds, we need not reach the issue of whether the court abused its discretion by admitting certain evidence of prior uncharged bad acts allegedly committed by appellants. *See Toliver v. United States,* 468 A.2d 958 (D.C.1983); *Drew v. United States,* 118 U.S.App. D.C. 11, 331 F.2d 85 (1964). The evidence of prior uncharged bad acts was admitted by the trial court against *both* appellants Butler and Jones, allegedly to help establish their identities and their association, because the evidence pointed to their in tandem activities prior to the commission of the principal offense. In view of our disposition, we leave to the sound discretion of the trial court, in the event of a new trial for Butler, the issue of whether any of this evidence should be admitted.

2. The defense presented no evidence.

3. Ms. Filosa also testified on redirect examination that the way Butler walked away "confused [her] as to whether her assailant was a man or a woman."

## II.

Appellants argue that the trial court abused its discretion by admitting excessive evidence of their homosexual relationship and Butler's effeminate characteristics and by allowing a barrage of related closing argument by the prosecution. They contend that the evidence and argument were unduly prejudicial and deprived them of their constitutional right to a fair trial.

 It is well-settled that evidence is relevant if it makes the existence of a contested fact that is of consequence to the determination of the action more or less probable than it would be without that evidence. *See Punch v. United States*, 377 A.2d 1353, 1358 (D.C.1977), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978) (citing *United States v. Carter*, 173 U.S.App.D.C. 54, 73, 522 F.2d 666, 685 (1975)). Although relevant, evidence may be excluded if its potential for prejudicial misuse by the jury substantially outweighs its probative value. *See Punch, supra*, 377 A.2d at 1358, and cases cited therein. In exercising its discretion, the trial court must weigh the probative value of the evidence in question against the risk of unfair prejudice. *See id.* Once a trial court has performed the requisite balancing and exercised its judgment, this court will disturb its ruling only upon a showing of abuse of discretion. *See id.*

 "Evidence of homosexuality has an enormous proclivity for humiliation and degradation" and, thus, poses a high risk of prejudicial impact on a jury. *Tinker v. United States*, 135 U.S.App.D.C. 125, 127, 417 F.2d 542, 544, *cert. denied*, 396 U.S. 864, 90 S.Ct. 141, 24 L.Ed.2d 118 (1969).[4] This is especially true where evidence of homosexuality is introduced against a criminal defendant who has a constitutional right to a fair trial. *See United States v. Provoo*, 215 F.2d 531, 537 (2d Cir.1954) (evidence of defendant's homosexuality elicited by government during cross-examination was inadmissible, because "[t]he sole purpose and effect of this examination was to humiliate and degrade the defendant, and increase the probability that he would be convicted not for the crime charged, but for his ... unsavory character").

The record reveals that appellants moved for a mistrial following the government's opening statement, in which the prosecutor, without prior notice to opposing counsel or judicial approval, told the jury that the evidence would show that the appellants were "intimate homosexual friends" who called each other "husband" and "wife baby" and that Butler went around "tell[ing] everybody that he was better than any woman for Jones." The trial court denied appellants' motion with a caveat. The court ruled that appellants' homosexual relationship, although irrelevant in and of itself, was relevant to show a unique association between the two defendants, which provided a basis for their being together at the time of the stabbing of Ms. Filosa, and to show the identity of Ms. Filosa's assailant. The court stated:

> Again, ... it seems to me based on what I have heard previously that his sexual orientation itself is irrelevant. The fact that it plays a role in the relationship between the two, the fact that it plays a role in the identification, it seems to me is relevant....

The court admonished the government's counsel, however, for not having at least "forewarned everyone" and directed him to "tone it down." The court also cautioned:

> It's one thing for you to say, I know Mr. Butler and Mr. Jones were lovers. I have no problem with them saying that. It puts them in the same location and also puts the relationship of the two together. I don't like the idea of emphasizing over and over again the fact [that] they are homosexual. *Maybe some members of the jury might be offended*

---

4. *See also* William H. Danne, Jr., Annotation, *Prejudicial Effect of Prosecutor's Reference In Argument to Homosexual Acts or Tendencies of Accused Which Are Not Material To His Commission of Offense Charged*, 54 A.L.R.3d 897, 900 (1974 and 1992 Supp.) (courts generally have recognized that imputation of homosexuality to a criminal defendant tends to disparage him or her in the eyes of the jurors).

*by that and hold it against the defendants....*

[Emphasis added.]

Prior to proceeding to hear testimony from the first witness, the trial court offered several times to give the jury a limiting instruction, but neither appellant asked for an instruction. Such an instruction, however, may have served only to emphasize the impropriety of the statements and thereby exacerbate their prejudicial impact. *See, e.g., Van Ness v. United States,* 568 A.2d 1079, 1083 (D.C.1990) (curative instruction would accentuate any improper influence drawn from prosecutor's argument); *United States v. Miranda,* 593 F.2d 590, 596 n. 7 (5th Cir.1979) (curative instruction in response to improper prosecutorial argument might only enhance the prejudicial impact and thus might in certain cases be inappropriate).

■ The prosecutor ignored the court's warning to "tone it down" and, to the contrary, proceeded to exploit every opportunity to remind the jury of appellants' homosexual relationship and, in particular, Butler's effeminate characteristics. In total, the trial transcript contains 37 such references in the testimony elicited from witnesses and an additional 31 such references in the government's closing and rebuttal arguments.[5] Although defense counsel objected to only a few of the excessive references to appellants' homosexuality and Butler's effeminate characteristics elicited by the prosecutor following the court's ruling on the mistrial motion, in our view it was unnecessary for defense counsel to raise any further objections. *See Wilkins v. United States,* 582 A.2d 939, 942 n. 7 (D.C.1990) ("An objection to evidence, once made and overruled, need not be renewed to the same type of evidence subsequently received.").

The only eyewitness testimony in the record that the person who assaulted Ms. Filosa was effeminate is the complaining witness's testimony that he walked away in a "very bouncy ... feminine" manner, which she said "confused [her] as to whether ... [he] was a man or woman." No other lay witness testified that Ms. Filosa described Butler that way. Moreover, no witness testified that the person who assaulted Ms. Filosa appeared in any way to be homosexual. Yet, based on that sole reference in Ms. Filosa's testimony, the government introduced the following excessive evidence of both appellants' homosexuality and Butler's effeminate characteristics:

Detective Roger Simpson was questioned as follows:

Q. Now, sir, was there anything about—during your talking with him—during the time you talked with him—in all about how long would you say you spent with Mr. Butler in your presence, talking with him throughout the investigation?

A. Approximately an hour.

Q. And during that period of time, was there anything noteworthy about his mannerisms, and his gestures, and his voice inflections?

A. He had effeminant [sic] mannerism[s], exaggerated state of femininity into his speaking.

Lorena Harris, the police officer who arrested Butler on an unrelated charge the day after the stabbing of Ms. Filosa occurred, testified that, on the day of the arrest, Butler had been drinking; was wearing his hair dyed reddish brown in a tail on the back of his head; was wearing a tight jacket; and was switching his hips as

---

5. We recognize that the conscientious trial judge attempted to strike a delicate balance early in the trial between probative and prejudicial evidence by allowing limited relevant testimony about appellants' homosexual relationship and effeminate tendencies to prove their unique association and to prove the identification of Ms. Filosa's assailant. We also recognize that in attempting to strike that balance, a trial judge will often not appreciate at the outset how prejudicial the evidence can become as the trial progresses; in other words, the probative value of the evidence can dissipate as a result of abusive efforts by one party to elicit and embellish repetitious, prejudicial testimony and to reinforce that prejudice through legal argument, all of which inures to the detriment of another party. *Cf. Parks v. United States,* 451 A.2d 591, 614 (D.C.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983) (repetition an important factor in determining the gravity of misconduct).

he walked. The prosecutor then asked: "And did he appear to be homosexual to you at the time[?]" Defense counsel objected, and the objection was sustained on the ground that the question was leading. The prosecutor thereafter elicited testimony from Officer Harris that at the time of the arrest, Butler spoke "with a light whisper, kind of a girlish voice." The officer described Butler's hand gestures in response to the prosecutor's direct question as "[v]ery feminine and nothing at all masculine about him."

Lena Ramos and Marco Vasquez, who had observed appellants prior to the stabbing, were called as witnesses by the government. Ms. Ramos was asked about Butler's mannerisms:

Q. Now, let me ask you, was there anything about his manner when he was approaching you, the way he spoke, the way he walked or the way he gestured with his hand which was remarkable to you and that you noted at the time?

A. Yeah, I thought he was very feminine.

Q. And what else? What was it about the way he walked?

A. Well, he kind of swayed up to me.

Q. And how about the way he talked?

A. Very feminine.

Q. And how about the way he gestured ... ?

A. Well, all the stereotypes that you think of when you think of someone that is ... feminine, he pretty much filled the bill.

Mr. Vasquez was also asked about his impression of Butler:

Q. Now, was there anything else about the man that struck you, the shorter man?

A. What struck me was one—was the way in which he spoke. I mean, the tone of his voice.

Q. What was that?

A. I found it kind of a—how could I say—feminine in trying to—someone who is trying to pretend. It's like out of a woman's—

Q. Go ahead?

A. Like that of a woman's voice.

Q. Higher pitch than a man's?

A. High pitch.

Q. How about the way he used his voice, the accent?

A. It was kind of dramatic sort of mannerism and sort of the way he went here, he talked to Ms. Ramos.

Q. What was your conclusion from what you saw?

A. Well, I thought immediately that probably was—it was a homosexual.

Finally, the government presented the testimony of Ms. Betty Hamilton, who at one time resided in the same house as the appellants. The government elicited testimony from her as to "how masculine or feminine Butler behaved":

Q. Yes. How did Mr. Butler act towards you or to other people, but in particular in presenting himself, how did he present himself to others?

A. To me?

Q. Yes.

A. Mr. Butler was not nice to me at all.

Q. But—okay. Could you characterize how masculine or feminine he behaved?

A. Mr. Butler did—well, Mr. Butler was rather feminine for a man.

Q. And what was it about his behavior that led you to the conclusion that he was very feminine for a man?

A. He wore wigs from time to time—wore a wig from time to time.

Q. What kind of wig?

A. An afro wig.

Q. A man's or woman's wig?

A. Looked like a woman's wig because I've seen women with that ... style of a wig on.

Q. What else?

A. He had his toe nails polished.

Q. What else? How did he dress in the evenings?

A. I do recall on one occasion Mr. Butler going out down the street with his—his wig, and a green robe with slits up the side, and a black bag.

Q. Now, sir—ma'am, excuse me, how would you characterize the relationship between Mr. Butler and Mr. Jones?

A. The relationship was more of a husband and wife.

Q. And was there anything in particular that Mr. Butler told you that corroborated your own conclusions?

A. Mr. Butler didn't tell me this directly.

Q. How did you hear it from him?

A. Just happened to be standing around outside at the time.

Q. And what was he saying?

A. That Mr. Jones was his husband.

Q. Did he refer to Mr. Jones by any affectionate or familiar name?

A. Daddy.

Q. Do you know what name Mr. Jones referred to Mr. Butler as?

A. Bertha.

Q. Any other name?

A. No.

The government's closing argument served to recount, reinforce, and embellish the witnesses' testimony as to the appellants' purported homosexuality and Butler's effeminate characteristics. As a reminder of the testimony given by Ms. Ramos and Mr. Vasquez, the prosecutor offered, *inter alia,* the description that they gave to police officers of Butler: "Mr. Butler was very effeminate in his gestures and his way of speaking." Speculating that "[i]f that knife had been angled over, that knife had penetrated the slightest bit deeper, it could have killed her[,]" the prosecutor asked rhetorically: "Was Mr. Butler concerned about little niceties like that when he went bam and walked by in that fluid bouncy way[?]"

Again speculating about what Ms. Filosa might have meant when she asked Detective Simpson not to write down her preliminary description of her assailant, because she wasn't sure "whether it's a white man or a black man, a white woman or a black woman[,]" the prosecutor asked: "[W]hat might she have meant?" The prosecutor then offered this answer:

How many black men do you see walking around with colored bleached tufts of hair on the back of their head? Not many? But you might if it was Mr. Butler. Mr. Butler doesn't dress like other black men. He doesn't act like other black men.

Recounting the testimony of the police officers who eventually arrested Butler, the prosecutor said:

Officer Harris told you that when she stopped [Butler] on the sidewalk, he was very effeminate. He had this—she called it a tail, bleached tail on the back of his head....

Officer Reese tells you that [Butler] has a switch in his walk. Ms. Filosa told you it was a bouncy walk. Officer Switch [sic] is a little more street smart than Ms. Filosa.

Reinforcing the testimony of Ms. Hamilton and the police officer who interviewed her to verify that the appellants lived together, the prosecutor stated:

Detective Belisle ... finally finds [Ms.] Hamilton, who lived with Mr. Jones and ... Mr. Butler at the same time, in the same house. And she says, yes, it's true, Mr. Jones called Mr. Butler Bertha. That's what the defendant told the officer his name was when he asked him for aliases, nicknames. He said Baby, Wife, Bertha.

And when they go to speak with Ms. Hamil[t]on, ... she says, yes, Mr. Jones called Mr. Butler Bertha and Mr. Butler called Mr. Jones Daddy. When Detective Belisle showed her this spread, she said that's the man that—that Jones calls his husband. And she told you that Mr. Butler has this large oversized Army jacket but that he also dresses in a feminine way. He paints his finger nails with fingernail polish. And that the relationship between Mr. Jones and Mr. Butler was that of a husband and wife.

■ Despite the trial court's initial admonition to the prosecutor to "tone it down," the prosecutor heedlessly escalated and introduced evidence about the defendants' sexual relationship far in excess of what was appropriate to establish the identity of the assailants. The trial court had a continuing responsibility to maintain a vigilance against prejudice. Regrettably, this did not happen. *Cf. Sousa v. United*

*States,* 400 A.2d 1036, 1041 (D.C.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 485, 62 L.Ed.2d 408 (1979).

 The excerpted testimony and prosecutorial closing argument concerning appellants' sexual proclivities belie the government's contention on appeal that references to the defendants' sexual proclivities were brief, to the point, and narrowly tailored to the purposes for which the evidence was elicited—namely, to prove appellants' identities and to establish that there was a unique bond between them. The evidentiary excesses in this case clearly amounted to "prosecutorial overkill," which this court has previously cautioned against. *Hill v. United States,* 600 A.2d 58, 64 (D.C.1991).

We, therefore, hold that the trial court abused its discretion by allowing the government to present excessive evidence and argument pertaining to appellants' homosexual relationship and Butler's effeminate characteristics. Only the references to Butler's feminine manner of walking after the assault were relevant to the issue of the identity of Ms. Filosa's assailant. The testimony that Butler lived with Jones was relevant to the issue of aiding and abetting by Jones. The remainder was superfluous testimony and closing argument that were plainly prejudicial and warrant reversal of both convictions. *See Johnson v. United States,* 596 A.2d 980, 984 (D.C.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1987, 118 L.Ed.2d 585 (1992) ("The determinations of relevance, materiality and whether probativeness outweighs prejudice are committed to the sound discretion of the trial court, and will not be overturned on appeal absent an abuse of that discretion."); *see also Tinker, supra,* 135 U.S.App.D.C. at 127, 417 F.2d at 544.

### III.

Jones also contends that the evidence of aiding and abetting was insufficient to sustain his conviction of assault with a dangerous weapon. The essence of his argument is that his mere presence was insufficient to establish that he knowingly participated in, or assisted with, the commission of the assault against Ms. Filosa. ·

 The standard for reviewing an insufficient evidence claim in a criminal case is well settled. The court must view the evidence presented at trial "in the light most favorable to the government, recognizing the [jury's] role in weighing the evidence, determining the credibility of witnesses, and drawing justifiable inferences from the evidence." *Ford v. United States,* 498 A.2d 1135, 1137 (D.C.1985). This court does not distinguish between direct and circumstantial evidence. *See Irick v. United States,* 565 A.2d 26, 30 (D.C. 1989). Moreover, the government is not required to negate every possible inference of innocence. *See id.* Reversal is permissible on sufficiency grounds only when there is no evidence upon which a reasonable juror could infer guilt beyond a reasonable doubt. *Robinson v. United States,* 506 A.2d 572, 573 (D.C.1986).

 In order to obtain a conviction under an aiding and abetting theory, the government must prove that: (1) a crime was committed by someone; (2) the accused assisted or participated in its commission; and (3) he or she did so with guilty knowledge. *Wright v. United States,* 508 A.2d 915 (D.C.1986); *cf. United States v. Salamanca,* 990 F.2d 629, 637–640 (D.C.Cir. 1993).

As to the first element, there is no dispute that Ms. Filosa was stabbed with a knife by someone. In this regard, there was sufficient evidence from which a trier of fact could conclude that appellant Butler was her assailant.

 As to the second element, to support an inference of guilty participation as an aider and abettor, proof of presence at the crime scene plus conduct which designedly encouraged or facilitated the crime is required. *See Griggs v. United States,* 611 A.2d 526, 528 (D.C.1992) (citations omitted). The evidence clearly established that Jones was present at the scene of the crime. Specifically, we have Ms. Filosa's testimony that prior to the incident she observed Butler talking to Jones and

saw both of them looking in her direction across Park Road. Then, very shortly before the stabbing, Jones brushed several inches in front of Ms. Filosa as he passed her and continued on his way up Sixteenth Street; by the time the stabbing incident had been carried out, Jones had turned around on Sixteenth Street. We also have Ms. Barnes's testimony that she saw Jones rejoin Butler and saw the two men walk away together, "laughing and talking." As *Griggs* makes clear, however, Jones's presence at the scene was not enough to establish his assistance or participation in the crime of assault with a dangerous weapon. 611 A.2d at 528; *see also Bailey v. United States,* 135 U.S.App.D.C. 95, 416 F.2d 1110 (1969) (mere presence at the scene of a crime, slight prior association with the primary actor, and subsequent flight held insufficient to sustain a conviction for aiding and abetting).

Evidence that Jones also conducted himself in a way which designedly encouraged or facilitated the crime committed is also required. *See Griggs, supra,* 611 A.2d at 528 (appellant who accompanied buyer to meeting with distributor of crack cocaine, introduced buyer as his cousin, and waited while buyer purchased the controlled substance held to have "clearly 'encouraged[d] and facilitate[d]' the principal's crime of distribution" (citation omitted)). Although Jones brushed several inches in front of Ms. Filosa very shortly before the stabbing, that act by itself does not provide a reasonable basis for an inference that Ms. Filosa was thereby distracted by him so as to facilitate or encourage the subsequent assault. Indeed, Ms. Filosa testified that she did not bother looking at Jones once he had passed her. Instead, she turned around to check on the children. According to her testimony, she "just wanted to get the line packed up ... and to make sure nobody was having trouble.... Sometimes, they don't get along and I just

wanted to make sure everybody was happy." Based on this record evidence, we cannot rationally conclude that a reasonable juror could infer that the conduct of Jones "designedly encourage[d] or facilitate[d] the crime." *Id.*

 As to the third element of aiding and abetting, i.e., guilty knowledge, the record is devoid of any evidence that Jones met the prerequisite of assistance or participation in the crime.[6] Accordingly, we hold that the evidence against Jones was insufficient to permit an inference that he was guilty of assault with a deadly weapon, on an aiding and abetting theory. *See Acker v. United States,* 618 A.2d 688 (D.C.1992), wherein we recently reaffirmed the earlier decisions of this court holding that:

> [M]ere presence at the scene of a crime committed by someone else, even with knowledge that an offense has been committed, is insufficient to sustain a conviction as an aider or abettor.

*See also In re L.A.V.,* 578 A.2d 708 (D.C. 1990) (conviction of a defendant as an aider and abettor to the crime of carrying an unlicensed pistol set aside, even though the defendant had driven the principal to the location where they were arrested and was seen conferring with him just prior to when the principal dropped the incriminating weapon, as the pair noticed police approaching them). We, therefore, reverse Jones's conviction for this offense.

## IV.

Accordingly, we reverse the conviction of appellant Butler and remand for a new trial. We also reverse the conviction of appellant Jones and remand for entry of a judgment of acquittal. *See Burks, supra,* 437 U.S. at 16, 98 S.Ct. at 2149.

*So Ordered.*

---

6. In any event, we cannot infer anything from the record before us about Jones's knowledge of the assault with a knife upon Ms. Filosa. All we have is the testimony of Ms. Filosa that Jones listened as Butler talked to him prior to the incident and the testimony of Ms. Barnes that the two men left the scene together "laughing and talking." We have no testimony whatsoever about what was said. Thus, there is no evidence in the record before us which could support the guilty knowledge requirement established by this court. *See Clark v. United States,* 418 A.2d 1059, 1061 (D.C.1980) (direct proof of knowledge required).