Leroy S. PETERSON, Jr., Appellant,

v.

UNITED STATES, Appellee.

Kenneth JOHNSON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 93–CF–693, 93–CF–762.

District of Columbia Court of Appeals.

Submitted Sept. 22, 1994.

Decided March 30, 1995.

---

John T. Moran, appointed by the court, was on the brief, for appellant Peterson.

Paul A. Signet, appointed by the court, was on the brief, for appellant Johnson.

Eric H. Holder, Jr., U.S. Atty., and John R. Fisher, Elizabeth Trosman, James H. Dinan, and Richard L. Chamovitz, Asst. U.S. Attys., were on the brief, for appellees.

Before WAGNER, Chief Judge, and TERRY and KING, Associate Judges.

Opinion for the court by Chief Judge WAGNER.

Concurring opinion by Associate Judge KING, with whom Associate Judge TERRY, joins, at p. ——.

WAGNER, Chief Judge:

Following a jury trial, each of the appellants, Leroy Peterson and Kenneth Johnson, was convicted of two counts of assault with a dangerous weapon (ADW) (D.C.Code § 22–502 (1989)), possession of a firearm during a crime of violence (PFCV) (D.C.Code § 22–3204(b) (1992 Supp.)), and possession of a prohibited weapon (sawed-off shotgun) (PPW) (D.C.Code § 22–3214(a) (1989)). The court sentenced Peterson to concurrent terms of incarceration of three and one-third to ten years for each count of ADW; a consecutive term of five to fifteen years for PFCV, and one year for PPW, concurrent with the other terms. The court sentenced Johnson under the provisions of the Youth Rehabilitation Act of 1985 (YRA) (D.C.Code § 24–803(b) (1989)) to an aggregate term of seven years. Both appellants argue for reversal on the ground that the evidence identifying them as the perpetrators of the crimes was insufficient to support the convictions.

Appellant Peterson argues for reversal on the following additional grounds: (1) insufficiency of the evidence to support a conviction of ADW on either an attempted-battery or an intent-to-frighten theory; (2) inadequacy of the jury instruction for ADW; and (3) failure of the trial court to instruct on an essential element of PPW, i.e., operability of the sawed-off shotgun. He further contends that the trial court failed to make an explicit finding that he would not benefit from treatment under the YRA, thereby requiring a remand for resentencing. We affirm.

## I.

The government's evidence showed that Homer Queen and Shannon Bond, the eleven year old daughter of Queen's fiancée, were at the teller's window of an Exxon station at 4650 South Capitol Street, Southeast, Washington, D.C. on November 29, 1992 at around 9:45 p.m. Bond testified that she saw "two boys" near a telephone booth staring at her, which made her quite apprehensive. As Bond re-entered the car Queen was driving, she noticed the same two people at the rear of the car, and she locked her door. Queen, who was trying to calm Bond, looked over and saw a man standing by Bond's window. The man knocked on the window with a gun. Queen testified that the gunman waved the barrel of the shotgun at him and Bond and that he saw a dark-skinned male standing at the gunman's back looking around. Queen heard the gunman say, "C'mon, moth-erf[___]." While starting the car, Queen heard the dark-skinned man tell the gunman " 'C'mon, f[___] it,' " and he heard Peterson say " 'C'mon motherf[___]'." Queen pushed Bond protectively onto the car's bench seat and drove out of the station's lot. As he drove away, Queen looked back and observed the two assailants walking toward a van.

In the next two to three minutes, Queen drove approximately one-quarter of a mile from the station and located two police officers, James McGee, Jr. and Kerry Poole. Queen told them what had happened. He described for the officers the man with the shotgun as a light-skinned, black male who was wearing a blue "team" jacket with white writing on the back, a white hat, and blue

jeans. The officers drove Queen back to the gas station in a marked police car, while Bond, who was hysterical, was taken home by an ambulance crew who were in the area.

When the police drove Queen into the 4600 block of South Capitol Street, he saw the two assailants, whom he recognized by their clothing, as they were walking about a block away. As the police car approached, both men looked over their shoulders and ran. Officer McGee chased the suspected gunman, later identified as Peterson, into a blue car where he fell to the ground. Officer Poole chased Johnson for about 25 feet, firing four shots at him, but he gave up the chase to help McGee handcuff Peterson.

Another police officer, Johnnie Patton, who had been working as an off-duty security guard that night at an apartment building across from the Exxon gas station, eventually caught Johnson. Officer Patton had been following Peterson and Johnson because of information he had received from a citizen who flagged him down. While Officer Patton was following the men in his pickup truck, he saw them look back at the marked police car, which pulled up, and run into an alley. Patton found Johnson hiding behind a car in a parking lot, trying to push his clothes and hat under it. Johnson started running again, but he stopped when Patton pulled his service revolver and commanded him to stop. Patton testified that he was certain that Johnson was the man he had followed from South Capitol Street.

Officer Patton recovered the articles of clothing from under the car and had Johnson put them on again. Initially, Queen told Officer McGee, "I can't tell if that is him or not because I didn't really see him." McGee related this to Patton, who asked if there was anything about Johnson which Queen could identify. According to Patton, Queen then stated "he could not identify the man but the clothes looked right."

At trial, Queen testified that he did not recognize the person's face, but the man he identified had the same complexion and wore the same clothes as the second person at the gas station that night. He also testified that he had seen the barrel of the gun and both men. Queen described the gunman as light-skinned and wearing a dark blue "starter" jacket with a grey, hooded sweatshirt underneath it. Bond testified that she saw only the person with the gun at the time of the incident, whom she described as light-skinned and wearing dark clothes. Bond identified Peterson in court as the man who held the gun that night. Queen had identified Peterson as the gunman within five to ten minutes after the assault. In court, Queen also identified Peterson as the gunman.

Officer Patton recovered a Remington, semi-automatic, sawed-off shotgun from under the blue car where Peterson had tried to hide his clothing. The weapon, which was 12½ inches long, had one live shotgun shell in the chamber and four additional live shells in its magazine.

Appellant Peterson testified at trial and offered an innocent explanation for his presence that night in the block where the gas station was located. According to Peterson, Johnson called him across the street for a light. He said he had just crossed the street when he heard the sound of brakes and saw a man dressed in blue who pointed a gun at him and ordered him to "[c]ome here." According to Peterson, he heard gunshots, and ran and fell. Peterson also testified that he did not notice whether Johnson ran, but he had seen some of the five or six people at a bus stop run. On cross-examination, Peterson admitted that a photograph which the government offered as an exhibit, accurately showed that on the night of his arrest he was wearing a grey, hooded sweatshirt and holding behind his back a blue "starter" jacket that he had been wearing. Peterson's counsel read the following stipulation into the record:

> On February 10th, 1993 Shannon Bond was shown a photo array of nine color photographs, which included photographs of the defendants Kenneth Johnson and Leroy Peterson. After viewing the photos, Ms. Bond indicated she did not recognize anyone. She then selected the picgures [sic] of each defendant, and a third individual, and indicated she recognized each of them from somewhere. This was the only

time Ms. Bond was shown any photographs.

## II.

 Both appellants argue that the evidence was insufficient to support their convictions because the eyewitness identifications were unreliable and the jury could not conclude beyond a reasonable doubt that they were the persons who committed the offenses. In evaluating a claim of evidentiary insufficiency, we must view the evidence in a light most favorable to the government, recognizing the jury's province to weigh the evidence, determine the credibility of witnesses, and make justifiable inferences from the evidence. *Nelson v. United States*, 601 A.2d 582, 593 (D.C.1991) (citation omitted); *Beatty v. United States*, 544 A.2d 699, 701 (D.C.1988) (citation omitted); *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987). "[T]he government is not required to negate every possible inference of innocence." *Jones v. United States*, 625 A.2d 281, 288 (D.C.1993). The evidence need not compel a finding of guilt beyond a reasonable doubt, and reversal for insufficiency of the evidence will be warranted "only if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *In re R.H.M.*, 630 A.2d 705, 707 (D.C.1993) (citation and other internal quotations omitted); *Nelson, supra*, 601 A.2d at 593 (citation omitted).

 Both appellants challenge the sufficiency of the evidence identifying them as the perpetrators of the crimes. In considering such challenges our focus is on the reliability of the identifications. *See Beatty, supra*, 544 A.2d at 701. Factors relevant to our determination include "the ability of the witness to make a meaningful identification— the witness' opportunity to observe and the length of time of the observations, the lighting conditions, the length of time between the observations and the identifications, the stimuli operating on the witness at the time of observation, as well as the degree of certainty expressed by the witness in making the identifications." *Id.* Even identification testimony of a single eyewitness will be sufficient so long as a "reasonable person could

find the identification convincing beyond a reasonable doubt, given the surrounding circumstances." *Id.* Moreover, circumstantial evidence of the identification, standing alone, may be sufficient to sustain a conviction. *See (Robert) White v. United States*, 484 A.2d 553, 557 (D.C.1984); *see also Nichols v. United States*, 343 A.2d 336, 344–45 (D.C.1975).

 The identifications of appellants made by Queen and Bond and the circumstantial evidence connecting appellants to the charged crimes provide compelling evidence of their identities as the perpetrators of the crimes in this case. Both Queen and Bond identified appellant Peterson in court. On the night that the crimes were committed, Bond had an opportunity to observe and notice him at the phone booth prior to the offenses, again at the rear of the car, and once more as he stood by her window with a shotgun. While she did not get a "real good look" at Peterson, she picked his photograph out of a nine-person photo array along with Johnson and another person and indicated that she recognized them from somewhere. She testified that she was sure that Peterson was the gunman when she identified him in court. Her inability to identify Johnson in court suggests her unwillingness to pick just anyone. This factor lends credence to the reliability of her identification of Peterson.

Moreover, Bond's identification of Peterson was corroborated by Queen's identification. Queen identified Peterson within five to ten minutes after the assault. He pointed out both appellants when he saw them the second time that night on the street, and he expressed no doubt when identifying Peterson as the gunman. The evidence showed that Queen had sufficient opportunity to observe Peterson. He described him accurately to the police prior to his apprehension. When arrested, Peterson matched the description of the gunman which Queen had given to the police. Circumstantial evidence also identifies Peterson as the perpetrator of the offenses. The police recovered a shotgun from the area where Peterson was caught. Peterson's flight could be considered as evidence of his consciousness of guilt. *See (John) Smith v. United States*, 558 A.2d 312, 316–17 (D.C.1989) (en banc) (flight indicates

consciousness of guilt when accused runs from crime scene and reacts to police presence); *see also* Criminal Jury Instructions for the District of Columbia, No. 2.44 (4th ed. 1993).

Similarly there was sufficient circumstantial evidence to identify appellant Johnson as the second assailant. Johnson was walking from the direction of the Exxon station with Peterson within five minutes of the assault and fled with him when the two of them apparently spotted the police. Johnson attempted to hide the clothing which would identify him, which demonstrates Johnson's consciousness of guilt. *(John) Smith, supra,* 558 A.2d at 316–17. Queen testified that appellant Johnson was wearing the same clothes as the second person and that he had the same complexion. *See Nichols, supra,* 343 A.2d at 344. Viewed in the light most favorable to the government, the evidence was sufficient to support both appellants' convictions.

### III.

Appellant Peterson argues that the trial court erred in denying his motion for judgment of acquittal on each count of ADW. He contends that the trial court's instructions for ADW did not adequately distinguish between the two theories of assault and covered only the attempted-battery type of assault. Further, appellant argues that, even if the instructions were sufficient, the evidence did not show the kind of menacing or purposeful conduct designed to engender fear which this court has found previously constitutes an attempt-to-frighten assault.

■■ It is reversible error to instruct the jury solely on the elements comprising an attempted-battery assault when the evidence adduced at trial can support only an attempt-to-frighten assault. *(Joseph) Smith v. United States,* 601 A.2d 1080, 1082 (D.C.1992) (despite sufficient evidence to support an attempt-to-frighten assault, reversal required

for insufficiency of the evidence where the jury instruction covered only attempted-battery assault); *McGee v. United States,* 533 A.2d 1268, 1270 n. 5 (D.C.1987). Contrary to Peterson's contentions, in this case the trial court adequately instructed the jury on the elements required for an intent-to-frighten assault.

The trial court instructed the jury, pursuant to Criminal Jury Instructions for the District of Columbia, No. 4.12 (3d ed. 1978), as follows:

You are instructed that an assault is an attempt or effort, with force or violence, to do injury to the person of another, coupled with the apparent present ability to carry out such an attempt or effort.

However, the court also instructed the jury further that:

To point a dangerous weapon at another person in a menacing or threatening manner, or to use a weapon in any manner that would reasonably justify the other person in believing that the weapon might be immediately used [against] him, constitutes an assault with a dangerous weapon.[1]

We have said that the inclusion of this instruction is sufficient to present the intent-to-frighten assault theory to the jury. *Robinson v. United States,* 506 A.2d 572, 574–75 (D.C.1986); *see also Parks v. United States,* 627 A.2d 1, 4 (D.C.1993) (intent-to-frighten assault includes situations where gun used in manner which justifies reasonable belief of victim that weapon might be used against him).

■ Peterson's argument that the conduct for which he was convicted was not the type to engender fear is also unpersuasive. The evidence disclosed that appellant Peterson first stared at Bond from a pay phone, then followed her to the car, knocked on Bond's window with the barrel of a shotgun, and brandished the barrel of it at Queen and Bond. This evidence was sufficient for the

---

1. Peterson's argument that these instructions are inadequate because the first part mirrors instruction no. 4.11 is not persuasive. Instruction 4.11 provides, in relevant part, as follows:

The essential elements of the offense of assault ... are:

1. That the defendant made an attempt or effort, with force or violence, to do injury to the person of another;

2. That at the time he made such an attempt or effort, he had the apparent present ability to effect such an injury....

jury to conclude that appellant acted in a manner which would reasonably justify Queen and Bond to believe that appellant would use the weapon against them. *See Parks, supra,* 627 A.2d at 7. Therefore, the evidence was sufficient to support the convictions of ADW on an intent-to-frighten theory. *See id.*

## IV.

■ Peterson also argues that the trial court erred in failing to instruct the jury that proof of operability of the sawed-off shotgun was a necessary element of possession of a prohibited weapon since operability is not "so closely related" to ADW and PFCV that the jury must have found that the shotgun was operable.[2] He also argues that there was insufficient evidence to establish that the shotgun was operable. The government concedes, as it must, that the trial court erred in not instructing the jury that one of the elements of PPW is the operability of the sawed-off shotgun. *Washington v. United States,* 498 A.2d 247, 249 (D.C.1985). However, the government argues that the omission of the instruction was not plain error.

Peterson did not specifically request that the court instruct the jury that the government must prove that the sawed-off shotgun was operable and failed to object to the trial court's omission; therefore, the standard of review is for plain error. "[R]eversal under the plain error doctrine is justified only in exceptional circumstances where 'a miscarriage of justice would otherwise result.'" *Harris v. United States,* 602 A.2d 154, 159 (D.C.1992) (en banc) (quoting *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)); *see also Curington v. United States,* 621 A.2d

819, 821 (D.C.1993). "[W]here the defendant has failed to object at trial to an error … the asserted error will be grounds for reversal only if it is 'so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial….'" *(Dorothea) White v. United States,* 613 A.2d 869, 874 (D.C.1992) (en banc) (quoting *Watts v. United States,* 362 A.2d 706, 709 (D.C. 1976) (en banc)).

However, appellant Peterson contends that the failure to instruct the jury on an essential element of a crime is *per se* reversible error notwithstanding a defendant's failure to object to the instructions given by the court. We have held that the failure to instruct on an essential element of an offense is not *per se* reversible, at least where

> the relevant facts are so closely related that no rational jury, shown by its verdict to have found the facts necessary to convict the defendant under the instructions as given, could have failed, if fully instructed on each element, to have found in addition the facts necessary to comprise the omitted element.

*Id.* at 879.[3] The government argues that the facts surrounding the commission of the offenses are so closely related that no rational jury could have failed to conclude that Peterson's sawed-off shotgun was operable. *See Curington, supra,* 621 A.2d at 823.

In *Curington,* this court found that reversal was not required when the trial court, which instructed on all elements of carrying a pistol without a license, failed to instruct the jury on the statutory definition of "pistol." *Id.* This court reasoned that "pistol" was merely a definition, not an element, and concluded that "the uncontroverted facts surrounding the commission of the offenses are

2. The trial court gave Criminal Jury Instructions for the District of Columbia, No. 4.82(A) (3d ed. 1978). This instruction does not state that one element of the offense is that the shotgun must be operable. Instruction No. 4.82(A) provides, in relevant part, as follows:

> The essential elements of the offense of possession of a prohibited weapon … are:
> 1. That the defendant possessed a sawed-off shotgun; and
> 2. That he had the intent to do the acts which constitute the possession of the weapon.

> The term "sawed-off shotgun" means any shotgun with a barrel less than twenty inches in length.

This instruction was replaced by Criminal Jury Instructions for the District of Columbia, No. 4.72(A) (4th ed. 1993), which expanded the definition of "sawed-off shotgun" to reflect explicitly the operability requirement.

3. In *White,* we did not reach any question of whether instructional omissions not within the context of this holding were *per se* reversible error. *(Dorothea) White,* 613 A.2d at 879 n. 24.

so closely related that no rational jury could have failed to find that the gun admittedly used by the appellant was a pistol." *Id.* Peterson argues, however, that, unlike *Curington,* the omitted portion of the instruction on operability is an essential element of the offense of possession of a prohibited weapon, and that therefore, the "closely related" test in *White* must be met. We conclude that the test was met here.

■ Operability can be proved by circumstantial evidence. *See, e.g., Washington, supra,* 498 A.2d at 249; *Bartley v. United States,* 530 A.2d 692 (D.C.1987). In *Bartley,* we affirmed a conviction of armed robbery (pistol) where proof of operability was required, although there was no evidence that the pistol had been fired during the commission of the offense or test fired thereafter. Nevertheless, we concluded that there was sufficient evidence of operability as follows:

> When [appellants] entered the Saferight store, each displaying a weapon to back up his demands, they both must have intended that their victims believed [sic] that the weapons were capable of being discharged. Just as it would have been reasonable for the Saferight employees to believe that appellants' weapons were operable, so too would it be reasonable for the jury to conclude likewise.

*Id.* 697–98. In the case before the court, the relevant facts were that Peterson wielded the sawed-off shotgun in a menacing manner, knocking on the car window and waving it at Queen and Bond; that the gun retrieved from under the car where Peterson apparently placed it was a Remington, semi-automatic, sawed-off shotgun; that the barrel of the gun was 12½ inches long; that the police removed one live shotgun shell from its chamber; and that four additional shotgun shells were in its magazine. As in *Bartley,* the circumstantial evidence was sufficient to prove operability. Moreover, it was such that no rational jury could have failed to find that the shotgun was operable if fully instructed on that element. *See Curington,* 621 A.2d at 823; *see also (Dorothea) White,*

613 A.2d at 879. Therefore, we find no basis for reversal on this ground.

## V.

Appellant Peterson's final claim is that the trial court failed to make an explicit finding that he would not derive benefit from treatment under the Youth Rehabilitation Act [of 1985 (YRA), D.C.Code § 24–801 *et seq.* (1989 & Supp.1990) ]. It is the government's position that the sentencing court expressed explicitly that it had considered and rejected sentencing appellant under the YRA because he would not derive a benefit from it and that the entire sentencing record shows that the trial court was aware of the alternative available under the Act. Assuming, without deciding, that a trial court must make a finding that a defendant would not derive a benefit from being sentenced under the YRA,[4] considering the overall record of sentencing, the trial court explicitly considered the option of sentencing appellant under the YRA and rejected it. This was sufficient. *See Dorszynski v. United States,* 418 U.S. 424, 444, 94 S.Ct. 3042, 3053, 41 L.Ed.2d 855 (1974); *Taylor v. United States,* 324 A.2d 683, 684–85 (D.C.1974).

For the foregoing reasons, the judgments of conviction appealed from hereby are

*Affirmed.*

KING, Associate Judge, with whom TERRY, Associate Judge, joins, writing separately:

■ We join Chief Judge Wagner's opinion in its entirety; however, with respect to Part V of that opinion, we hold that D.C.Code § 24–803(d) does not require the sentencing judge to make an express finding that an age eligible offender will not derive a benefit from Youth Rehabilitation Act (YRA) treatment, before imposing an adult sentence. *See* D.C.Code §§ 24–801 *et seq.* (1989 & Supp.1990). The unambiguous language of the statute only requires the sentencing judge to make a formal finding, *i.e.,* that a youth offender *will* derive a benefit, when opting to impose a YRA sentence. D.C.Code § 24–803(c) provides, in pertinent part that:

---

4. This court has considered whether a no-benefit finding is required under the Act only in the context of sentencing after the revocation of YRA probation where the court had determined previ-

ously that the youthful offender would derive benefit from treatment. *(James) Smith v. United States,* 597 A.2d 377 (D.C.1991).

(c) Where the court finds that a person is a youth offender and determines that the youth offender *will derive benefit* from the provisions of this chapter, *the court shall make a statement on the record of the reasons for its determination....*

*Id.* (emphases added). By contrast, § 24–803(d) provides that:

(d) If the court shall find that the youth offender will not derive benefit from treatment under subsection (b) of this section, then *the court may sentence the youth offender under any other applicable penalty provision.*

*Id.* (emphasis added).

Although this court has held that a no-benefit finding is required before a sentencing judge can impose an adult sentence upon revocation of probation imposed under the YRA, *see (James) Smith v. United States,* 597 A.2d 377, 382–83 (D.C.1991), we have never held that a no-benefit finding is required before a sentencing judge may initially impose such a sentence.[1] In our view, the language of the statute does not support such a holding.

---

**1.** An examination of the briefs filed in *Smith* reveals that the question of whether or not a sentencing judge must make a no-benefit finding was never discussed by the parties because the sentencing judge did not make a no-benefit finding and the defendant did not contend, on appeal, that the judge erred in failing to do so. For that reason it is not at all clear that the division in *Smith* needed to resolve the issue it purported to decide, *i.e.,* that a no-benefit finding is required before imposition of an adult sentence after revocation of a YRA probation.