Ronnie ERSKINES, Larry
Hagans, Appellants,

v.

UNITED STATES, Appellee.

Nos. 95–CF–270, 95–CF–410.

District of Columbia Court of Appeals.

Argued May 21, 1997.
Decided June 26, 1997.

M. Elizabeth Kent, appointed by this court, Washington, DC, for appellant Erskines.

Janet C. Hoeffel, Public Defender Service, with whom James Klein and Gretchen Franklin, Public Defender Service, were on the brief, for appellant Hagans.

D. Ames Jeffress, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher and Lisa Prager, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and KING, Associate Judges, and BURNETT, Associate Judge of the Superior Court.*

FARRELL, Associate Judge:

Appellants were both found guilty by a jury of an array of crimes including felony murder, kidnapping, and armed robbery. On appeal each contends that the evidence was insufficient to prove that a kidnapping (the predicate of the felony murder) took place. Hagans argues in addition that the evidence failed to show that he aided and abetted Erskines in the kidnapping, and further contends that under our decision in *Akins v. United States*, 679 A.2d 1017 (D.C.1996), the trial court abused its discretion in not severing his case from Erskines' because the role of aider and abettor in which the government cast him may have caused the jury to impute to him inculpatory admissions by Erskines. We reject these as well as appellants' remaining arguments, and affirm except for the necessity of partial resentencing. See part IV, *infra.*

**I.**

Viewed in the light most favorable to the jury's verdicts, the evidence was as follows. In November 1992, Joseph Morris–Bey and Karen McPherson were dealing drugs together. A few days before November 8, 1992, Morris–Bey had received cocaine valued at three or four thousand dollars, which he showed to Hagans and Erskines and

which, in their presence, he put in a safe at his Holbrook Terrace apartment. On November 8 at about 6:00 p.m., appellants entered the Holbrook Terrace apartment and, finding Mary Morris–Bey there (Joseph's wife), asked if "Joseph and Karen [were] still locked up." Since Joseph was not present, appellants left saying they would return. At about 8:30 p.m., three men including appellants entered the apartment again. Appellants each brandished guns and forced Mary to open the safe, from which they took two checks; they also stole her wedding rings. The drugs, as Joseph testified, were at the home of his brother that evening. After the robbers had gone, Mary called her husband at Karen's house on Westminster Street and told him what had happened. Joseph returned to the apartment and drove Mary and their daughter to his brother's house.

Meanwhile, Joseph had asked Karen McPherson's nieces Tedra and Alma to help him look for Karen. At about 10:00 p.m. the same evening, Tedra found Karen on the corner of Ninth and Westminster Streets seated in the driver's seat of Joseph's rental car. Erskines was in the back seat, and Hagans stood outside. When Tedra told Karen that Joseph was looking for her, Karen "told [Tedra] to go home. She didn't say anything. She didn't even roll her window down. She just told [Tedra] to go ahead home." Soon afterward, Alma watched from the Westminster Street home as Karen pulled up in front in Joseph's car, followed by a second car that belonged to Erskines and Hagans. Karen and Erskines got out of Joseph's car and began walking up to the house, Erskines "right behind" Karen. He had his gun drawn and, according to Alma, was "about to shoot [Karen]," an action which Alma demonstrated to the jury. Joseph, who was in the doorway of the house, also saw Karen walk toward him with Erskines close behind her, holding a gun; Hagans stood beside the second car. Joseph told Erskines to "hold up" because there were kids in the house, but instead Erskines

* Judge Arthur L. Burnett, Sr. was designated as part of this division pursuant to D.C.Code § 11– 707(a) (1995).

pointed the gun at Morris–Bey and began shooting at him, striking him once. Karen tried to run back to the car but tripped and fell, whereupon Erskines shot her repeatedly. She died at the scene from four bullet wounds in her body.

Subsequently, Erskines admitted to a cellmate in jail that he had robbed Mary Morris–Bey and her daughter, that he later put a gun to Karen McPherson's head to make her take him over to the Westminster house where he was going "to rob them," and that he shot Joseph and then Karen when she "broke camp" and tried to run. These admissions were submitted to the jury with instructions to consider them only as to Erskines and not Hagans.

## II.

■ Appellants contend that this evidence fails to demonstrate that Karen McPherson was kidnapped and did not, instead, accompany them to the Westminster house voluntarily for unknown reasons.[1] As to Erskines, this argument collapses once his jailcell admissions are taken into account.[2] Even without the admissions, however, the entire combination of events fairly allowed the jury to conclude that Karen was detained against her will as she drove back to her home, with Erskines behind her, and walked up the front path followed closely by Erskines holding a gun. Alma's testimony that he was "about to" shoot Karen, plainly inconsistent with voluntary presence on her part, was confirmed seconds later when he in fact shot her repeatedly as she tried to flee. Moreover, appellants' knowledge that Joseph and his drug-partner Karen had a valuable quantity of drugs that appellants had not found during the Holbrook Terrace robbery

furnished a motive which the jury could reasonably infer caused Karen's detention as appellants ushered her to her home where they expected Joseph would be.

■ Hagans' contention that, assuming Erskines kidnapped Karen, the proof did not show that he aided and abetted the crime fails for much the same reasons. Hagans candidly acknowledges that if the jury could rationally link the Holbrook Terrace events to the Westminster detention and shooting, it could fairly find that he had allied himself with the kidnapping (and consequent felony murder) under established aiding and abetting principles. We see nothing unreasonable in a finding that the robbery at Joseph's apartment was related to his possession of valuable drugs, and that when appellants did not find Joseph or the drugs there, they pursued him to Karen's home using her as an unwilling accomplice, perhaps a shield or a hostage. The evidence thus permitted the jury to find more than Hagans' "mere presence" with Erskines as the latter directed Karen toward the door of her home and shot her when she tried to flee.

Other evidence as well suggests that Hagans "conducted himself in a way which designedly ... facilitated the crime." *Jones v. United States*, 625 A.2d 281, 289 (D.C.1993). When Tedra McPherson initially encountered Karen, Erskines was seated in the car with Karen while Hagans stood outside. Then, when Karen was seen driving back to her house on Westminster Street, Erskines was in the back seat of the car while Hagans followed in another, which belonged to both appellants.

The evidence was sufficient to support appellants' convictions each for kidnapping and felony murder.

---

1. "The involuntary nature of the seizure and detention is the essence of the crime of kidnapping." *Head v. United States*, 451 A.2d 615, 624 (D.C.1982).

2. Erskines maintains that the indictment was constructively amended when the proof, particularly his admissions, showed an intent to rob Joseph Morris–Bey and others (including, by inference, Karen) whereas the indictment alleged kidnapping of Karen "for the purpose of assaulting her." This argument has no merit. Robbery

includes the element of use of force or violence (assault), and, at all events, an allegation of the particular purpose for which a kidnapping was carried out is surplusage. *See, e.g., Davis v. United States*, 613 A.2d 906, 912 (D.C.1992) (involuntary detention "may be for any purpose that the defendant believes might benefit him"). An indictment's specification of the particular purpose for a kidnapping carries no "legal significance." *See Wooley v. United States*, 697 A.2d 777, 787 (D.C.1997) (Farrell, J., concurring in the judgment).

## III.

As pointed out, Erskines' jailcell admissions were introduced in evidence with an instruction telling the jury they could be considered only against him and not Hagans. In addition, the trial court redacted the admissions so that Erskines was reported speaking only in the first person, in conformity with *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987). Hagans nevertheless contends that these measures were inadequate to protect him against the confession of a codefendant whom he was unable to confront, *see Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), for the same reason we found such measures inadequate in *Akins v. United States, supra*. Specifically, for purposes of *Bruton* analysis, Hagans contends there is no conceptual difference between his alleged role as aider and abettor and the alleged coconspirator status of the defendants Barnes and Carrero in *Akins*, as to whom we found redaction and a limiting instruction ineffective. We conclude, to the contrary, that our holding in *Akins* rested upon the "unique theory of [vicarious] liability," *Akins*, 679 A.2d at 1028, on which the jury was instructed in that case, and that this holding may not be transposed to the related but distinctively different context of aiding and abetting.[3]

In *Akins* the defendants were charged with conspiracy as well as substantive offenses. Our treatment of the Confrontation Clause issue turned upon the "special considerations" presented by "a joint trial based on a conspiracy theory." *Id.* at 1028. In particular, the government requested and the jury was given an instruction under *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), saying essentially that once a conspiracy among the defendants was

found, "whatever any codefendant did was equally attributable to" the others *if done in furtherance* of the agreement *"regardless of the personal involvement of the defendant in the [substantive] crime."* 679 A.2d at 1031, 1027 n. 9 (emphasis added). We held that a limiting instruction also given that allowed use of confessions by nontestifying defendants only against the declarants was contradicted and nullified by the *Pinkerton* instruction effectively "requir[ing] that proof of one defendant's guilt be counted against all members of the conspiracy," and so "permitting convictions based *solely* on the actions of a coconspirator." *Id.* at 1027, 1029 (emphasis added).[4]

Aiding and abetting, on which the jury was instructed here, resembles *Pinkerton* liability but nonetheless differs from it significantly. Unlike the latter, aiding and abetting does not make "the personal involvement of the defendant in the [substantive] crime" irrelevant. To the contrary, the jury was correctly told that to convict Hagans as an aider and abettor it had to find that he "knowingly associated himself" with the person who committed the crime, "participated in the crime as something he wished to bring about," and "intended by his actions to make it succeed." *See Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949). It was further told that "[s]ome affirmative conduct by [Hagans] to help in planning or carrying out the crime is necessary." And, while under *Pinkerton* a defendant is liable for a foreseeable criminal consequence of the conspiracy even though that crime "was not intended as part of the original plan," *see Akins*, 679 A.2d at 1027 n. 9, the jury was told repeatedly that to convict Hagans of the crime it had to find that he *"intentionally* participate[d]" in it (emphasis

---

3. We note the government's point that, although Hagans moved repeatedly for severance from Erskines in light of the prosecutor's intent to use Erskines' admissions, he never based those motions on the asserted effect aiding and abetting would have in linking him "vicariously" to Erskines' admissions. In light of our conclusion in the text, however, we need not decide whether our review should appropriately be for plain error.

4. As the confessions at issue were made after and not in furtherance of the conspiracy, they did not fall within the hearsay exception for coconspirator statements. 679 A.2d at 1028. We left open the question whether a more pointed limiting instruction than the one given in *Akins* could avoid the *Bruton* problem in a case where a vicarious liability instruction was also given. *See id.* at 1037 (Farrell, J., concurring); *id.* at 1037–39 (Schwelb, J., concurring in part and dissenting in part).

added)—only then could he be liable for acts of another (*e.g.*, the felony murder) that were "the natural and probable consequence" of it.[5]

The aiding and abetting instruction, in short, directed the jury's attention to Hagans' knowing participation (or not) in the Westminster Street crimes in a manner very different than had the *Pinkerton* instruction in *Akins*. The direct imputation of another's acts and admissions that concerned us in *Akins* (despite a limiting instruction) is not a danger here where the jury was told in various ways that "affirmative" participation in the kidnapping by Hagans was necessary before he could be convicted.

Hagans makes the imaginative argument that the jury nonetheless used Erskines' confession against him at least partially because its "first step" in analyzing his liability as aider and abettor must have been to find that "a crime was committed by *someone*," *Jones*, 625 A.2d at 288 (emphasis added), in doing which it would have considered all of the evidence of Erskines' guilt, including his confession. The jury would then not have "recognized"—hence the futility of a limiting instruction—"that it was using the confession against Hagans when later deciding that Hagans' *own* actions aided and abetted the crime." It is apparent that, even on Hagans' own terms, the limiting instruction here was asked to carry much less freight than it was in *Akins*, where it competed with an instruction letting the jury impute the co-defendant's confession to the defendant entirely, including on the issue of identity. More basically, nothing in the aiding and abetting instruction causes us to believe the jury analyzed Hagans' liability in the way Hagans describes—first deciding, wholly apart from his conduct, whether a crime "was committed" and only "later" deciding whether he participated in it. From start to finish the instruction focuses on the nature and degree of the accomplice's own involvement even though, unlike a principal, he need not have "personally committed each of the acts that make up the crime." The fact, therefore, that in reviewing the sufficiency of the evidence our decisions have broken down aiding and abetting into "elements" of proof (*i.e.*, looking "first" to whether "a crime was committed by someone," and then to whether the defendant participated with guilty knowledge), *Jones, supra*, does not persuade us that a jury disregards a defendant's own actions at any point in applying the accomplice instruction.

We are satisfied, in sum, that the aiding and abetting instruction directed the jury to Hagans' own "affirmative conduct" as to both the commission of the crimes and his participation in them; and that in these circumstances the jury was able to obey the limiting instruction to disregard Erskines' admission of guilt as to Hagans.

## IV.

■ Appellants' remaining arguments require little discussion. First, the asserted *Brady* material[6] was turned over by the prosecutor in time for Erskines to make full use of it in cross-examining witnesses. *See, e.g., Matthews v. United States*, 629 A.2d 1185 (D.C.1993). Second, assuming solely for argument' sake that Detective Whalen's notes containing statements by Joseph Morris–Bey to another detective were "Jencks" material within the meaning of Super. Ct. Crim. R. 26.2 (1997), our review of those notes reveals no possible prejudice to Erskines from their nondisclosure.[7] Third, any

---

5. *Compare* Paul H. Robinson, *Imputed Criminal Liability*, 93 YALE L.J. 609, 666 n. 226 (1984) ("[T]he *Pinkerton* doctrine allows conviction for substantive offenses without satisfaction of either the actus reus or mens rea element of the substantive offense.") *with id.* at 614 n. 10 ("The rules of complicity generally impute the objective elements of the offense *upon a showing of the actor's contribution to the criminal venture, the actor's culpability as to his contribution, and the culpable state of mind necessary for the commission of the offense.*" (emphasis added)) (citing

MODEL PENAL CODE § 2.06(3)-(4) (Proposed Official Draft 1962)).

6. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

7. Erskines alleges two other Jencks violations, neither of which warrants concern. Alma McPherson's description of Erskines was in fact turned over by the prosecution before Alma's testimony. Erskines' contention that the material should have been produced pretrial in accor-

arguable error in the court's limitation on appellants' right to announce a defense of third-party perpetration in their opening statements, *see Winfield v. United States*, 676 A.2d 1 (D.C.1996) (en banc), was neutralized when the court gave appellants full rein to develop that theory at trial and argue it to the jury in accordance with the evidence; furthermore, the court itself instructed the jury as to the defendants' theories that a third party may have killed Karen McPherson. Fourth, for reasons already explained in addressing the sufficiency of the evidence, there was no misjoinder of the counts arising from the Holbrook Terrace incident and those derived from the Westminster Street events. *See Taylor v. United States*, 603 A.2d 451, 456 (D.C.1992).

 Finally, the government concedes as to each defendant that one of the two murder convictions must be vacated and that, similarly, their convictions for assaulting Mary Morris–Bey with a dangerous weapon must be vacated as a lesser included offense of armed robbery. The government also agrees that appellants' ten-year mandatory minimum sentences for commission of a crime of violence while armed must be vacated because it did not file the necessary enhancement papers before trial. *See Smith v. United States*, 356 A.2d 650, 652 (D.C.1976).[8] We therefore remand for resentencing by the trial court in accordance with these concessions. In all other respects, the judgments of the Superior Court are

*Affirmed.*

dance with *Brady* has been addressed *supra*. Second, Detective Stanton's notes taken while showing a photo array to Alma McPherson were produced as Jencks material for Detective Stanton. This alleged violation was never pursued below despite the prosecutor's offer to recall Alma as a witness, and Erskines makes no argument as to prejudice.

8. Further, the government concedes that Erskines' mandatory minimum sentence of five years for assault with intent to kill was erroneous since the offense was not indicted as "while armed."