Michael A. FREEMAN, Michael E. Gaither, and Alan Colter, Appellants,

v.

UNITED STATES, Appellee.

Nos. 94–CF–769, 94–CF–804 and 94–CF–896.

District of Columbia Court of Appeals.

Argued Nov. 20, 1995.

Decided Feb. 13, 1997.

---

Lynne A. Green, for appellant Michael A. Freeman.

Joseph H. Green, Jr., submitted on the brief for appellant Michael E. Gaither.

Daniel J. McGuan, Rockville, MD, for appellant Alan Colter.

Richard E. Dominguez, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Thomas C. Black, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and FARRELL and RUIZ, Associate Judges.

RUIZ, Associate Judge:

A jury found appellants Michael Freeman, Michael Gaither, and Alan Colter guilty on charges arising from an altercation on May 3, 1993, with the complaining witness, Mr. Cousart. Appellant Freeman was convicted of assault with intent to murder while armed with shod foot in violation of D.C.Code §§ 22–503 and –3202 (1989). Appellant Gaither was convicted of assault with intent to kill while armed with shod foot in violation of D.C.Code §§ 22–501 and –3202. Appellant Colter was convicted of assault with intent to kill while armed with a knife and shod foot in violation of D.C.Code §§ 22–501 and –3202. Appellants Freeman and Gaither were each sentenced to not more than twelve years under the Youth Rehabilitation Act and Colter received five to fifteen. years' incarceration.

Appellants raise essentially the same arguments on appeal: Freeman and Colter allege that the trial court erred in admitting motive evidence claiming it was irrelevant and prejudicial;[1] Colter and Gaither claim reversible prosecutorial error;[2] and, Freeman and Gaither contend that the trial court erred in not admitting Cousart's medical records. We affirm in all respects.

1. In addition, all appellants argue that the trial court erred by not subjecting the motive evidence to a *Drew* analysis.

2. In his brief, appellant Freeman requested that this court incorporate any additional issues raised by appellants Colter and Gaither.

## I.

Cousart testified that on May 3, 1993, he took the bus to North Capitol Street and Florida Avenue with a friend, Mr. Telefair, in order to visit his son. Cousart admitted drinking two beers before commencing his bus ride to North Capitol Street. Being a former resident of the neighborhood, Cousart stopped along the street to converse with two acquaintances, Ms. Doris Hawkins and Mr. Larry Nellins.

According to Cousart, Gaither then approached and stated "What are you looking at, you bitch motherfucker?" Next, Freeman choked Cousart from behind as Gaither struck Cousart in the face. Cousart testified that he saw Colter approach while swinging what appeared to be a knife with a blade approximately four to five inches long.[3] Colter struck Cousart's left side as Gaither continued to strike his face. Cousart fell to the ground while Gaither and Colter continued the beating and Freeman continued the choke hold. While on the ground all the appellants commenced kicking Cousart. At some point during the beating, Gaither stated, "We are going to kill your motherfucking ass this time, nigger." When Telefair intervened, appellants stopped the beating and fled. As Cousart walked to his son's house he noticed that he was bleeding and that he had been stabbed three times in the side. Cousart again saw appellants on the street and at that point ran to his son's house where the police were called and he was taken to the hospital.

Ms. Hawkins testified for the government that Colter and "a whole gang of boys" approached Cousart. She heard Gaither ask Cousart "what's up, bitch motherfucker." From approximately ten feet away, she saw Gaither strike Cousart while Freeman held him. As Gaither struck Cousart, Hawkins testified that Colter had his hands in his pockets. She testified she was trying not to watch the fight, but when she looked back at

3. Cousart testified that he had known each of the appellants for approximately 10 years.

the group, Gaither was fighting with Cousart who was on the ground. She did not see a knife, or the movements that Colter made, if any.

Detective Payne of the Metropolitan Police Department interviewed Cousart shortly after Cousart arrived at the hospital. According to Payne, Cousart's description of the parties and events on the night of May 3, was consistent with his trial testimony.[4]

The government presented evidence that the fight and stabbing of Cousart were motivated by the desire to retaliate against Cousart for testifying against Mr. Timothy Doyle, a friend of appellants'.[5] In the present case, Cousart testified that he was shot five times in August, 1991, by Doyle. On direct, the government elicited that Cousart subsequently testified against Doyle in January, 1992, and that Doyle was convicted of the shooting.

To show motive and a connection between appellants and Doyle, the government put on evidence of appellants' relationship with Doyle. Detective Payne testified for the government that he was familiar with Cousart because he had investigated the case against Doyle. As part of the shooting investigation, Payne interviewed Gaither and Colter who stated they grew up with Doyle and were close friends. During the investigation Payne learned about a verbal altercation between Cousart and Doyle that took place in a barbershop a few months prior to the shooting. Doyle, Gaither and Colter and a couple of other individuals, but not Freeman, were in the barbershop when Cousart entered. Payne testified that Gaither had stated during the interview that Cousart was preaching to Doyle and the group about getting jobs and doing something productive with their lives. Gaither told Payne that he was annoyed with Cousart for preaching what he characterized as "foolishness." Payne also testified that in 1991 he saw all of the appel-

lants in the 1400 block of North Capitol Street "hanging out" with Doyle. Payne continued to see appellants together in the same area after Doyle was convicted in 1992.

Freeman and Gaither each testified about the events of May 3, 1993. Freeman testified that as he was exiting a drugstore he saw Gaither fighting with Cousart. In an effort to break up the fight, Freeman grabbed Cousart from the front while Telefair grabbed Gaither.[6] When an unidentified person sitting on a nearby vehicle pulled out what appeared to be a gun, the other parties fled. According to Freeman, Cousart then walked over to a vehicle and pulled out a gun. Freeman and Gaither met up after seeing Cousart with the gun and began walking together towards Gaither's house. When they reached the house, Cousart was waiting and pulled out a gun from a black bag. Freeman testified that at this point he ran to his grandmother's house. At no point did Freeman see anyone stab Cousart. Freeman testified that he had known Doyle for approximately four years, but did not "hang out" with Doyle, and did not know that Cousart had testified against Doyle in the shooting incident.

Gaither testified that on May 3, 1993, he saw Cousart and asked Cousart if they could talk about why Cousart was looking for him with guns and why Cousart was telling people he was going to kill him. According to Gaither, an argument ensued and a fight broke out. After Freeman and Colter broke up the fight, Cousart stated "I'm going to kill y'all." After the fight, Gaither and Freeman met on the way to Gaither's house and when they arrived Cousart was waiting. Like Freeman, Gaither testified that Cousart reached into a black bag and pulled out a gun. Gaither then fled. Gaither testified that he never called Cousart any names, that at no point was anyone on the ground fighting, and that he did not see anyone stab Cousart.[7] On cross-examination, Gaither

---

4. At the hospital, Cousart identified appellants to Payne by name.

5. No evidence was provided by the government that any one of the appellants was present at the shooting of Cousart.

6. Appellant Freeman claimed he was acting in defense of appellant Gaither and the trial court instructed the jury accordingly.

7. Appellant Gaither claimed self-defense and the trial court instructed the jury accordingly.

testified that he had known Cousart for six years and had an "all right" relationship with him until the incident at the barbershop. Colter did not take the stand.

Appellants raise three issues on appeal: 1) the trial court erred in admitting the motive evidence, 2) the trial court erred in not admitting Cousart's entire medical record, and 3) the government committed reversible prosecutorial error.

## II.

■ We address first appellants' allegations that the trial court erred in admitting the motive evidence regarding the Doyle–Cousart shooting.[8] To be admissible, evidence must be competent and relevant, and it should not be admitted if countervailing factors, such as prejudice, outweigh its probative value. *Keene v. United States*, 661 A.2d 1073, 1076 (D.C.1995) (quoting *Johns v. United States*, 434 A.2d 463, 473 (D.C.1981)). Questions concerning the relevance or materiality of evidence rest within the sound discretion of the trial court. *Street v. United States*, 602 A.2d 141, 143 (D.C.1992) (citing *United States v. Mosby*, 495 A.2d 304, 305 (D.C.1985)). The admission or exclusion of evidence will be disturbed only upon a finding that the trial court abused its discretion.[9] *Keene v. United States*, 661 A.2d 1073, 1076

(D.C.1995) (quoting *Brewer v. United States*, 559 A.2d 317, 320 (D.C.1989); *Street, supra,* 602 A.2d at 143; *Reavis v. United States*, 395 A.2d 75, 78–79 (D.C.1978)).

■ This court has previously set out a three-part inquiry to determine whether evidence is relevant:

First, the evidence, to be relevant, must relate logically to the fact that it is offered to prove. This logical relationship is described as a "tendency of evidence to establish a proposition." Second, the fact sought to be established by the evidence must be material, which is to say that the party must establish that fact as a condition to prevailing on the merits of his case. Finally, the evidence must be adequately probative of the fact it tends to establish. This does not mean that the evidence, standing alone, must be sufficient for the court to permit the case to go to a jury, but it must tend "to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence."

*Reavis, supra,* 395 A.2d at 78 (citations omitted). Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice. *(George) Jones v. United States*, 625 A.2d 281, 284 (D.C.1993).[10]

The evidence at issue in this case was neither of a criminal act by appellants nor of an act which was in the nature of a criminal offense by appellants and therefore does not require a strict *Drew* analysis. Nonetheless, we understand appellants to make a *Drew*-like argument that prejudice from Doyle's earlier crime, the shooting of Cousart, would harm them with the jury because of appellants' friendship with Doyle.

**8.** Appellants argue that the trial court should have analyzed the admissibility of the testimony regarding the Doyle–Cousart shooting under the "other crimes" paradigm promulgated in *Drew v. United States*, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964). *Drew* held that evidence demonstrating that a defendant has committed other crimes is inadmissible to prove that the same defendant has a propensity to commit the crime at issue. *Id.* at 15, 331 F.2d at 89; *Jones v. United States*, 477 A.2d 231, 237 (D.C.1984); *Campbell v. United States*, 450 A.2d 428, 430 (D.C.1982). *Drew*, however, also held that such evidence may be admissible if relevant to (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or plan, or (5) identity. *Drew, supra,* 118 U.S.App. D.C. at 16, 331 F.2d at 90; accord *Jones, supra,* 477 A.2d at 237; *Wheeler v. United States*, 470 A.2d 761, 769 (D.C.1983). The *Drew* analysis applies also to prior uncharged misconduct and "bad acts," "but not to acts that are not, at least, 'minimally in the nature of a criminal offense.' " *Bigelow v. United States*, 498 A.2d 210, 212 (D.C.1985) (quoting *Wheeler, supra,* 470 A.2d at 769).

**9.** A review for abuse of discretion requires a four-step determination: (1) whether the matter at issue was committed to the trial court's sound discretion; (2) whether the trial court recognized that it had the discretion, and if so, whether the court purported to exercise that discretion; (3) whether the record reveals sufficient facts upon which the court based its decision; and (4) whether the trial court exercised its discretion erroneously. *(James) Johnson v. United States*, 398 A.2d 354, 363–365 (D.C.1979).

**10.** As of this court's *en banc* opinion in *Johnson v. United States*, 683 A.2d 1087, 1094 (D.C.1996), the relevant balancing test is that of Federal Rule

The government argues that evidence of the Doyle–Cousart shooting showed that there was "bad blood" between appellants and Cousart, and that this evidence was probative of appellants' motive for their attack of Cousart in the present case. In short, the government contends that:

Gaither's and Colter's presence at the barbershop, appellants' friendship with each other and with Doyle, coupled with numerous observations that all three appellants were 'hanging out' with Doyle, circumstantially illustrated their motive to retaliate against Cousart's testimony against their friend. When combined with Gaither's statement, '[w]e are going to kill your motherfucking ass this time, nigger,' there was admissible and relevant motive evidence.

The government contends that this is a proper use of motive evidence, that appellants did not demonstrate to the trial court any prejudice from inclusion of the evidence, and that even if the admission of the evidence was improper, the error was harmless as to all appellants.[11]

Appellants argue that the evidence was improperly admitted because it was irrelevant or because its probative value was decidedly outweighed by the danger of unfair prejudice and its propensity to mislead and confuse the jury. Specifically, they argue that admission of the motive evidence invited the jury to decide the case on an improper basis—guilt by association. According to appellants, the picture of them as close friends and associates of Doyle, in conjunction with the testimony of the Doyle–Cousart shooting, may have caused the jury to improperly decide their guilt based upon their association with Doyle.

In response to appellants' concerns, the trial court stated,

"[w]ell, if it's all that weak, it won't be very prejudicial, will it? They'll just look foolish. But it's not other crimes evidence; it's kind of a theory. It certainly sounds like he has enough to cross whatever threshold one would need on relevance, and that is really the only standard he needs to meet here. So I'll permit that."

We agree that evidence of appellants' friendly relationship with Doyle, as buttressed by other evidence tending to show that appellants may have acted in retaliation for Cousart's earlier testimony against Doyle that led to Doyle's conviction of the shooting of Cousart, was relevant to show motive for the attack on Cousart with which appellants were charged in this case. The evidence was sufficient to distinguish this case from those cases in which evidence has been held to be irrelevant or unduly prejudicial because the jury was being asked to infer guilt from a defendant's mere association with guilty parties or groups.

Questions involving guilt by association have arisen with the most frequency in challenges to articulable suspicion, probable cause and sufficiency of the evidence. *See Duhart v. United States*, 589 A.2d 895, 898–99 (D.C.1991) (rejecting articulable suspicion arguments based on guilt by association); *Irick v. United States*, 565 A.2d 26, 30 (D.C. 1989) ("guilt by association is a very dangerous principle");[12] *Smith v. United States*,

---

of Evidence 403, whether the "probative value is substantially outweighed by the danger of unfair prejudice."

11. The government contends that because appellants did not sufficiently identify any particular prejudice or request that the trial court balance the probative value of the evidence against its prejudicial effect, their claim on appeal should be reviewed for plain error. As for Colter and Gaither we find no error, let alone plain error, that would require reversal. We find, however, that Freeman sufficiently raised the issue by pointing out that there was no evidence linking Freeman with Doyle's shooting of Cousart other than that they were acquainted.

12. In *Irick, supra*, the court deemed it a "very dangerous principle" to infer culpability based solely on two brothers' blood relationship. 565 A.2d at 30. More than a mere blood relationship existed, however, to enable the jury to legitimately infer collaboration between the two brothers beyond a reasonable doubt. *Id. See United States v. McDougald*, 990 F.2d 259, 262 (6th Cir.1993) (finding the evidence insufficient to support a conviction because "[a]lthough circumstantial evidence may be used to show knowledge, this rule does not condone guilt by association") (internal citations omitted); *United States v. Nusraty*, 867 F.2d 759, 764 (2d Cir.1989) (reversing conviction based on insufficient evidence, in part because, "mere association with those implicated

558 A.2d 312, 315 (D.C.1989) (en banc) (eschewing the concept of guilt by association). In reviewing a probable cause determination, we recently stated that " '[g]uilt by association without more is not part of our jurisprudence.' " *Funchess v. United States,* 677 A.2d 1019, 1021 (D.C.1996) (quoting *McDonald v. State,* 53 Ala.App. 394, 300 So.2d 837, 838 (Crim.App.1974)). The Supreme Court made it clear in *United States v. Di Re,* 332 U.S. 581, 593, 68 S.Ct. 222, 227, 92 L.Ed. 210 (1948), that companionship with a defendant at the time of the defendant's criminal conduct is not in and of itself sufficient to establish probable cause for arrest of the companion.

Other jurisdictions have expressed similar concerns regarding convictions based on guilt by association. In *United States v. Parada–Talamantes,* 32 F.3d 168, 170 (5th Cir.1994), the court reversed a defendant's conviction finding that the trial court improperly admitted evidence suggesting that the defendant was guilty because of association with his brother is criminal conduct. The Fifth Circuit found that the evidence had no bearing on Parada except that the seller of the van was his brother and held that the evidence was unduly prejudicial. *Id.* at 169–70. The court noted, "[t]o saddle Parada's defense with the transgressions of his brother places a sisyphean burden on this search for the truth effectively foretelling the result." *Id.* at 170. The court reiterated that "a defendant's guilt may not be proven by showing that he is related to an 'unsavory' person." *Id.* (quoting *United States v. Singleterry,* 646 F.2d 1014, 1014 (5th Cir.1981)).

More recently, the Seventh Circuit in *United States v. Irvin,* 87 F.3d 860, 866 (7th Cir.1996), held that evidence of gang membership was inappropriately admitted because the membership "served as a substitute for . . . direct evidence, increasing the chance of guilt purely by association." The court noted that the probative value of evidence of gang membership was minimal where the government's contention was that "the defendants' common membership in the motorcycle gang made it more likely that

in an unlawful undertaking is not enough to

they were involved in the drug transaction together." *Id.* at 864.

In contrast to the above-cited cases, in this case we find no abuse of discretion in the admission of evidence of the Doyle–Cousart shooting in the context of the appellants' relationship with Doyle because there is no significant danger that conviction rested merely on guilt by association. Here, there was evidence that appellants had a prior and continuing friendly relationship with Doyle. That association and the shooting were relevant to appellants' motive for committing the charged offense; it explained the reason why there might be "bad blood" between appellants and Cousart. Moreover, it is not merely the appellants' association with Doyle which was introduced as evidence of their participation in the crime charged. There was other evidence which tended to show that appellants assaulted Cousart to avenge Doyle.

Specifically, both appellants Colter and Gaither were present in the barbershop when Cousart and Doyle had the verbal altercation that apparently led to Doyle shooting Cousart. Both Colter and Gaither told Officer Payne that they were good friends with Doyle. During the stabbing, appellant Gaither is alleged to have stated, "[w]e are going to kill your motherfucking ass this time, nigger." The evidence with respect to Freeman was not as strong: Freeman was not at the barbershop, was not a life-long friend of Doyle's, and was not alleged to have made any comments during the stabbing. Officer Payne, however, testified that he frequently saw appellants (including Freeman) and Doyle "hanging out" together. Payne's testimony was confirmed by Doris Hawkins, a friend of Freeman's family. Moreover, according to Cousart's testimony, even after Cousart was on the ground, Freeman continued to choke him and joined the others in kicking him. Doris Hawkins, who witnessed the assault, testified that Freeman had held Cousart while Gaither struck him. From the assault itself, therefore, the jury could rationally find that Freeman was an active participant in a concerted attempt to kill Cousart.

prove knowing involvement").

We conclude, therefore, that admission of the evidence of Doyle's shooting Cousart was not an abuse of discretion. We note that when the prosecutor mentioned Doyle's shooting of Cousart during closing argument, the trial court promptly instructed the jury that there was no evidence of appellants' involvement in Doyle's shooting of Cousart.[13] The jury was not impermissibly permitted to infer appellants' guilt merely by their association with Doyle. Rather, the jury, properly instructed, was allowed to consider evidence that tended to show appellants' motive to kill Cousart because of Cousart's earlier testimony against appellants' friend, Doyle.

### III.

■ We now turn to Gaither and Freeman's claim that the trial court erred in not admitting the unredacted portion of Cousart's medical records pertaining to alcohol intoxication. The government entered into evidence certain portions of Cousart's medical records from the hospital where he went after the stabbing. Appellants moved for the admission of the portion of the records that mentioned "alcohol intoxication" and included a reference to a blood alcohol content. Appellants argued that the intoxication was relevant to Cousart's ability to observe and relate accurately the events of the day in question. The trial court would not admit the reference to alcohol intoxication unless an expert witness explained the terms "alcohol intoxication" and "blood alcohol level" to the jury. The trial court also questioned whether the reference to "alcohol intoxication" in the medical records was a reliable diagnosis given the lack of information regarding who made the statement and on what it was based. In balancing the probative value of the medical records concerning intoxication versus the potential for prejudice, the trial court stated:

I don't think there is enough meaning to the phrase alcohol intoxication to—I think the tendency to mislead far outweighs its ability to edify anything. The only evidence we had is that he [Cousart] had two

beers. There's not been any testimony from anybody as to his condition other than that. The fact that a doctor wrote alcohol intoxication, I don't know what that means. Maybe they wrote it because he said he had two beers. Maybe he wrote it because he appeared falling down drunk to the doctor. To me this isn't a medical diagnosis that would have any meaning to a jury. I'm not going to allow it to be put in front of them without a witness to explain it.

Thus, the trial court did not preclude altogether the admission of the unredacted medical records, but merely placed a condition on their admission—that appellants provide an expert witness to explain the significance of the reference to the jury in terms of its effects on Cousart's perception and ability to recall.

Appellants place great emphasis on a sentence in *Durant v. United States,* 551 A.2d 1318, 1325 (D.C.1988), which reads, "a diagnosis of alcohol intoxication is admissible under the business records exception because it is reliable and a jury's understanding of the basis and significance of such a diagnosis would not be significantly aided by cross-examination of the physician who rendered the opinion." The corresponding footnote to this sentence, however, is applicable to appellants' situation. The footnote states that an expert would be necessary to testify regarding "the effect of alcohol intoxication on the ability to perceive and recall." *Id.* at 1325 n. 5. Challenging Cousart's ability to perceive and recall is precisely why appellants wanted the reference to alcohol intoxication admitted, and why the trial court held that an expert was needed.

■ As noted previously, questions concerning the relevance or materiality of evidence rest within the sound discretion of the trial court. *Street, supra,* 602 A.2d at 143. Whether the evidence should be excluded because its potential for prejudice substantially outweighs its probative value is within the trial court's discretion. *(George) Jones, supra,* 625 A.2d at 284. Here, the trial court

---

**13.** The trial court instructed the jury that "there is no evidence whatsoever in the case that these defendants had any involvement in any prior shooting and you should disregard that argument."

balanced the probative value of the evidence against its potential for prejudice and limited the evidence that could be admitted. We cannot say that the trial court abused its discretion in excluding the evidence without the aid of an expert witness.

## IV.

■■■ Finally, appellants allege that various comments by the prosecutor were improper and warrant reversal. When reviewing an allegation of prosecutorial error, we must first determine whether any of the challenged comments were improper. *McGrier v. United States*, 597 A.2d 36, 41 (D.C.1991); *Dixon v. United States*, 565 A.2d 72, 75 (D.C.1989). If the comments were improper, then we must, "viewing the remarks in context, 'consider the gravity of the [impropriety], its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case.'" *McGrier, supra*, 597 A.2d at 41 (quoting *Dixon, supra*, 565 A.2d at 75). Where an appellant does not object at trial, reversal of a conviction is appropriate only when "a miscarriage of justice would otherwise result." *Id.* (quoting *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985)). If the claim is properly preserved, an appellant must have suffered substantial prejudice in order to warrant a reversal. *Id.* We must be able to say that "'the judgment was not substantially swayed by the error.' The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Id.* (quoting *Gaither v. United States*, 134 U.S.App. D.C. 154, 172, 413 F.2d 1061, 1079 (1969) (quoting *Kotteakos v. United States*,

328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946))). With these principles in mind, we turn to the specific allegations raised by appellants.

■■■ Colter and Gaither raise overlapping claims of prosecutorial impropriety. Both contend the prosecutor committed error during closing argument when he argued that a government witness, Ms. Hawkins, was scared to come to court to testify.[14] Objections were timely noted and the trial court promptly instructed the jury that "what a lawyer thinks is not relevant at all, and it's up to you to assess the credibility of witnesses."[15] Appellants did not request further instructions, thereby signaling satisfaction with the curative instructions given by the trial court. Even assuming that the prosecutor's comment was improper, appellants were not substantially prejudiced in light of the trial court's clear instructions to the jury.[16] *See Lawson v. United States*, 596 A.2d 504, 510 (D.C.1991) ("Without any indication to the contrary, we must presume that the jury followed these instructions.").

■■■ Various allegations of prosecutorial impropriety center around the prosecutor's comments during rebuttal at closing. The prosecutor, in addressing the jury stated:

I've got to get serious here for a second and tell you that it's sad, and it's true, that first of all, there is really no good reason to kill somebody.

Second of all, it doesn't take much in this town any more to decide to kill somebody. People are killed everyday.

An objection was timely noted by Gaither's counsel and the trial court immediately told

---

**14.** Specifically, the prosecutor stated:

You remember Doris Hawkins because she was, I guess, what you'd call the reluctant witness. Remember she was only down here because she was under the impression that I would lock her up if she didn't come down here. In other words, she was compelled to testify. She didn't come down here because she wanted to testify.

And I submit to you, ladies and gentlemen, that she was scared to come down here. And I think that when you assess her credibility—

**15.** In its general charge the trial court instructed the jury that "statements and arguments [by the

lawyers] are not evidence" and lawyers are not permitted to express personal beliefs or opinions during the case "[s]o if you think a lawyer has expressed a personal belief or opinion during argument, disregard it and judge this case based only on the evidence."

**16.** The bulk of the prosecutor's statement was supported by the record. Ms. Hawkins indicated she was a reluctant witness by stating that she testified "[b]ecause I'm afraid y'all going to lock me up."

the jury that other cases have no bearing on their decision. Although these comments were inappropriate, we fail to see how appellants were substantially prejudiced by the remarks given the trial court's prompt curative instruction.

 At another point in rebuttal, the prosecutor stated, "[l]ook, they [appellants] tried to shoot this guy [Cousart] before." Both counsel for appellants Colter and Gaither objected to the reference that appellants had been participants in the earlier Doyle–Cousart shooting. Directly implicating appellants with the previous shooting was improper; there was absolutely no evidence to support the accusation and the trial court admitted the shooting evidence only to show motive. Following the prompt objection, the trial court told the jury that "there is no evidence whatsoever in the case that these defendants had any involvement in any prior shooting and you should disregard that argument." Appellants appeared to be satisfied with this instruction as they did not ask for additional cautionary or curative instructions. Again, although the prosecutor's comment was improper, appellants were not substantially prejudiced considering the trial court's prompt curative instruction.

 Lastly, appellants claim the prosecutor made another error in rebuttal when he stated:

Ladies and gentlemen, this is a very simple case. Mr. Cousart was brutally attacked. It's important to the complaining witness, Mr. Cousart; it's important to this community. It's important to the Government.

. . . .

Ladies and gentlemen, this is your opportunity to make a difference. It's your opportunity—

 Colter's prompt objection to this line of argument was overruled by the trial court. It was inappropriate for the prosecutor to suggest to the jury that they should send a message to the community by convicting appellants. *See Thomas v. United States,* 619 A.2d 20, 24 (D.C.1992) (stating that "this court has repeatedly condemned prosecutorial requests that the jurors 'send a message' either to the defendant or to the community"). Although the prosecutor's inappropriate comments should have been stricken by the trial court, the prosecutor mitigated any prejudice by immediately stating:

Ladies and gentlemen, it's your job to decide the guilt or innocence of the defendants. It is not the defendants—it's not to make a difference, it is not to send a message, it is not to do anything for the community. It's to decide whether the Government has proven their case or not. You have no other job here at all.

The immediate rephrasing of the argument mitigated any prejudice to appellants.[17]

---

17. Appellant Colter makes several other arguments of prosecutorial misconduct. First, the prosecutor characterized Ms. Hawkins' testimony as stating that appellants "all came in a pack" down the street toward Cousart. This statement was not objected to at trial, and is supported by Ms. Hawkins' testimony that she saw "a whole gang of boys" coming toward P street. Second, that during closing argument the prosecutor improperly attempted to bolster Cousart's credibility, and improperly referred to Colter as "Speedy." We find these allegations meritless; even assuming any error, they did not substantially prejudice Colter. Third, that the prosecutor improperly referred to Colter's failure to testify by referring to the testimony of appellants Gaither and Freeman in a manner and time sequence that implied that the jury had not heard from Colter. After review of the record, we find the references by the prosecutor were not error and did not inappropriately refer to Colter's right not to take the stand. Fourth, Colter argues that the prosecutor improperly appealed to the passions and prejudices of the jury by stating that it was the jury's job "to decide the guilt or innocence of the defendants." While it is true that the jury need not find a defendant innocent in order to acquit, the trial court properly instructed the jury on the government's burden of proof. Finally, appellant Colter claims that the prosecutor's reference in rebuttal to Cousart's medical records and the gesture by the prosecutor pointing his hand and finger at Cousart as if he had a gun was improper. The prosecutor stated, "when you look at these medical records, . . . it doesn't just say that they're superficial wounds . . . Sort of like I take a gun and shot it at Mr. Cousart sitting over there, aiming for his head. I can miss him entirely and my intention could still be to kill him." Although the transcript doesn't reflect the gestures by the prosecutor, the government does not contest the actions alleged by Colter. We find this claim of prosecutorial misconduct was not prejudicial in the context of an explanation of the intent element of assault with intent to kill while armed.

Finally, Gaither claims that prosecutorial error occurred when the prosecutor stated, during his cross-examination, that he would bring back Detective Payne unless Gaither told the truth. Counsel objected to the comment and the trial court immediately instructed the jury to disregard it. Even assuming the comment was improper, we cannot say Gaither was substantially prejudiced by the remark.

To summarize, the trial court did not abuse its discretion in admitting evidence of the Doyle–Cousart shooting as motive evidence against appellants. Admission of the unredacted portions of Cousart's medical records were properly conditioned on the assistance of an expert witness. Finally, although in a number of instances the prosecutor committed error, these errors did not substantially prejudice any of the appellants. For the foregoing reasons, appellants' convictions are affirmed.

*So ordered.*