Ronald E. BATES, Appellant,

v.

**UNITED STATES, Appellee.**

**No. 98–CF–101.**

District of Columbia Court of Appeals.

Argued Nov. 2, 1999.

Decided June 15, 2000.

---

Mack E. Davis, appointed by the court, for appellant. Tamara A. Shockley, Washington, DC, appointed by the court, was on the brief for appellant.

Mary Patrice Brown, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Gary H. Collins, and Michael G. Geffroy, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, SCHWELB, and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Appellant Ronald Bates appeals from his convictions for possession with intent to distribute cocaine, possession of drug paraphernalia, and possession of marijuana.[1] Bates raises three issues for our review: whether physical evidence was obtained in violation of his Fourth Amendment rights, whether the evidence at trial was sufficient to support his convictions, and whether the trial court erred in denying a mistrial as the remedy for the prosecutor's improper rebuttal closing argument. We affirm.

## I.

Ronald Bates was arrested along with his co-defendant, Maurice Clayborne,[2] on April 9, 1996. According to the government's evidence at both the suppression hearing and the trial,[3] Officer Ralph Shumac and his partners were on patrol in an unmarked vehicle on the night of April 9 in the Barry Farms area of Southeast Washington. As they drove, the officers noticed Bates and Clayborne standing beside a parked car, described as an older model black Ford, in the 1300 block of Stevens Road. The police had received several anonymous complaints that narcotics were being sold out of an abandoned automobile in that block. As the officers pulled up, Bates threw a brown paper bag that he was holding into the trunk of the Ford, closed the trunk lid, and started to walk away with Clayborne. The officers got out of their car, and Bates and Clayborne broke into a run. Officer Shumac pursued Bates on foot while Officer Phillip McNichol ran after Clayborne. Although the officers were not in uniform, Officer McNichol was wearing a tactical vest with the word "Police" written across its front and back. During the chase, Officer Shumac saw Bates toss ziplock bags containing a white rock-like substance (which turned out to be crack cocaine). Officer McNichol

1. Bates was originally charged in a seven-count indictment with possession with intent to distribute cocaine while armed, possession of drug paraphernalia, possession with intent to distribute marijuana, possession of a firearm during the commission of a crime of violence or dangerous offense, carrying a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition, in violation of D.C.Code §§ 33–541(a)(1) (1998), 22–3202 (1996), 33–603(a), 33–541(a)(1), 22–3204(b), 22–3204(a), 6–2311 (1995), and 6–2361(3). Bates was acquitted of the weapons charges. He was also acquitted of the charge of possession with intent to distribute marijuana, though he was convicted of simple possession of marijuana as a lesser included offense.

2. Mr. Clayborne's convictions are not a subject of this appeal.

3. "In reviewing a trial court order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc). The trial court found "highly credible" the unimpeached testimony of Officer Shumac, who was the sole government witness at the suppression hearing. We defer to that credibility determination. *See Lawrence v. United States,* 566 A.2d 57, 60 (D.C.1989). In reviewing the trial court's denial of a motion for judgment of acquittal, we view the evidence in the light most favorable to the government. *See Curry v. United States,* 520 A.2d 255, 263 (D.C.1987).

saw Clayborne remove a handgun from his waistband and throw it to the ground.

Officer Shumac caught up to Bates and arrested him. He turned Bates over to Officer Joseph Haggerty, who escorted Bates back to the parked Ford. Retracing his path, Officer Shumac retrieved nine ziplock bags which Bates had discarded. Meanwhile, Officer McNichol arrested Clayborne and recovered the handgun which Clayborne had dropped. After receiving the ziplock bags from Officer Shumac, Officer Haggerty pried open the trunk of the Ford and searched it. The brown paper bag found inside the trunk—the bag which the police saw Bates put there—held 99 ziplock bags containing crack cocaine, plus hundreds of empty ziplock bags. The police also recovered from the trunk a large quantity of marijuana, one large white rock of crack cocaine, a digital scale and approximately $152 in cash.

A search of Bates' person at the scene yielded two marijuana cigarettes. At Seventh District Police Headquarters, another officer searched Bates more thoroughly and discovered approximately twelve ziplock bags of crack cocaine in Bates' pants leg and boot.

According to the police narcotics expert who testified at trial, the street value, quantity and packaging of the crack cocaine and marijuana were indicative of distribution rather than possession for personal consumption by a single person.

Bates presented no evidence of his own at trial.[4]

## II.

■ The trial court concluded that the police had probable cause to arrest Bates and to search the trunk of the parked Ford. We agree with that ruling. After Officer Shumac saw Bates drop nine ziplock bags with white rocks in them, the officer had probable cause to arrest Bates for possession of crack cocaine. *Cf. Unit-*

*ed States v. Wider,* 293 U.S.App.D.C. 16, 19, 951 F.2d 1283, 1286 (1991) (finding probable cause to arrest where officer observed suspect abandon a bag containing white rocks). The subsequent searches of Bates' person, which resulted in the seizure of marijuana and crack cocaine, were lawful as incident to his arrest. *See United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Having seen Bates put a brown paper bag he was holding in the trunk of the car next to which he was standing, shut the trunk lid, run away, and discard bags of crack cocaine as he ran, the police had probable cause to believe that there was contraband in both the brown paper bag and the trunk. *Cf. United States v. Brown,* 708 A.2d 637, 639 (D.C.1998); *Wider,* 293 U.S.App.D.C. at 19, 951 F.2d at 1286. Under the so-called automobile exception to the warrant requirement of the Fourth Amendment, the police therefore were permitted to search the trunk, and any containers in the trunk which might contain contraband, without having obtained a search warrant. *See Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."); *California v. Acevedo,* 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) (warrantless search of container located in automobile permissible if based on probable cause to believe container holds contraband); *United States v. Ross,* 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (warrantless search of container located in automobile permissible if based on probable cause to believe contraband is in automobile and could be found in container).

■ We also agree with the trial court that the evidence was sufficient to permit the jury to find Bates guilty beyond a reasonable doubt, *see Curry, supra* note 3,

---

4. Clayborne did present an unsuccessful de- fense of mistaken identification.

520 A.2d at 263, of possession with intent to distribute cocaine,[5] possession of drug paraphernalia,[6] and possession of marijuana.[7] If the jury credited the testimony of the arresting officers, as it obviously did, the evidence of Bates' guilt, as summarized above, was overwhelming. *See, e.g., Spriggs v. United States,* 618 A.2d 701, 704 (D.C.1992); *Chambers v. United States,* 564 A.2d 26, 31 (D.C.1989).

### III.

We now address Bates' claim of improper prosecutorial argument. Bates contends that the trial court should have granted his motion for a mistrial after the prosecutor made what Bates calls an "improper appeal to the racial sensitivities of the jury" in the government's rebuttal closing argument. The government, while arguing that the prosecutor was "provoked by defense counsel's racially charged and unsupported closing argument," agrees that the rebuttal was improper. The government argues, however, that a mistrial was not required because the trial court immediately and forcefully instructed the jury to disregard the improper comment, the comment did not bear directly on Bates' guilt or innocence, and the case

against Bates was a strong one. We find that in the heat of Bates' trial, both counsel made inappropriate—in some instances, highly inappropriate—comments that were calculated to divert the jury from reasoned consideration of the evidence presented in the courtroom. We conclude nonetheless that, in view of all the circumstances, the corrective action taken by the trial court was effective to ensure that Bates was not substantially prejudiced.

### A. The Rebuttal Argument in Context

Bates' defense theory at trial was that he was an innocent bystander who fled when the police suddenly drove up and jumped out of an unmarked car because he feared that they were going to rob him.[8] Bates' trial counsel proposed that when the police stopped and searched Bates and discovered that all he had on him were two marijuana cigarettes, they manufactured the other charges against him. Beginning with a confrontational opening statement, Bates' counsel charged that the police had "falsely accused" Bates, were "lying," and would commit "perjury" under oath, and that the prosecutor would "be struggling to defend" the police fabrications.[9]

---

5. *See* D.C.Code § 33–541(a)(1). To secure a conviction for a violation of this statute, the government was required to prove beyond a reasonable doubt that Bates possessed cocaine, knowingly and intentionally, and with the intent to distribute it.

6. *See* D.C.Code § 33–603(a). With respect to the scale and the empty ziplock bags, the government could obtain a conviction for possession of drug paraphernalia by proving that Bates possessed those items with the intent to use them to "test, analyze, pack, repack, store, [or] contain" a controlled substance (in this case, the cocaine or marijuana).

7. *See* D.C.Code § 33–541(d). Bates was prosecuted on the more serious charge of possession with intent to distribute marijuana. He was convicted of simple possession as a lesser included offense. To prove that Bates was guilty of simple possession of marijuana, the government needed only to establish that he possessed marijuana knowingly and intentionally.

8. Bates himself never testified to this, but Clayborne explained that he ran because the officers did appear to be robbers.

9. Defense counsel threw down the gauntlet in his opening statement as follows:

I'm going to say it right now. The police are lying. They will lie when they get on the stand and so the finger pointing is going to be directed at his [i.e., the prosecutor's] witnesses and the smile on the Government's attorney's face will be no longer on it at the end of this case, because he'll be struggling to defend what his police officer did on April 9th, 1996, which is this: falsely accused that man [i.e., Bates] of a crime.
\* \* \*
These are police officers. They come in here, quoting the Government, veiled in some cloak of truthfulness. Forget about it.
April 9th, they come out like robbers. And they chased him down, ladies and gentlemen, and they chased him down like a dog in an alley and then they found on him some marijuana.

When Officer Shumac was cross-examined, he did not agree that Bates could have mistaken him and his fellow officers for robbers. Officer Shumac explained that he had worked in the neighborhood for over seven years, and that people frequently recognized him as a police officer even when he was in plain clothes. In the questioning that followed, Bates' trial counsel sought to attribute Officer Shumac's testimony on this score to racial bias:

[DEFENSE COUNSEL]: Okay. Because you're familiar with Barry—you work 7–D. You work Barry Farms. It's a high crime area, correct? Right?

[OFFICER SHUMAC]: That's correct.

Q: Okay. And people get robbed all the time, correct?

A: On occasions, they do.

Q: Okay. And they get robbed by white people and they get robbed by black people, right?

\* \* \*

A: ... To the best of my knowledge, I've never heard of a white individual going into Barry Farms robbing somebody..

Q: Okay. So it's only the black people over there committing the crimes?

[PROSECUTOR]: Objection.

THE COURT: Oh, Mr. [defense counsel]. Sustained.

In closing argument, Bates' counsel insisted over and over that the police officers were telling "lies." Counsel added that "[t]he Government wants to call that just normal testimony ... [b]ut when the Government puts on witnesses who tells [sic] you lies, ladies and gentlemen, that's corruption." Building on his exchange with Officer Shumac, Bates' counsel also argued that the "mindset of the prosecution in this case" was based on racist assumptions:

[W]hat the Government wants you to believe, and particularly what Officer Shumac wants you to believe, is that somehow everybody in the neighborhood ... knows who they are, that they're the police.

It's quite an assumption, ladies and gentlemen. Everybody in Barry Farms is some how so intimately involved with criminal activity, that they all know who the police are. Ladies and gentlemen, I don't accept that, you don't accept that, and that's not what common sense or the facts of this case tell you, that everybody in Barry Farms knows who the police are. That's sort of part of a bunch of baloney that they're feeding you in this case.

\* \* \*

They want you to believe that—and Officer Shumac was a prime example. He says, well, I said, you know, a couple of white guys jumping out of a car and never saying who they are, running after two guys at gun point. They would think you're a robber, right. Oh, no, white people have never committed a robbery in Barry Farms. This is this man's testimony.[10]

\* \* \*

Now, ladies and gentlemen, that's another—that gives you the mindset of the officers in this case. It gives you the

And it turns out that they're a little disappointed. They were a little disappointed. So, what do they do? They go to a car that's on the street that my client is standing next to and they open the car and they find drugs in there. And what do they say? Oh, those are your drugs, Mr. Bates. Those are your drugs Mr. Clayborne.

\* \* \*

Ladies and gentlemen, I'm not going to mince words. You're going to hear perjury on the stand.

10. The prosecutor objected at this point, and defense counsel undertook to correct himself by stating, "What Officer Shumac said was in his experience, in all the years he's been an officer, no White guy has ever come down to Barry Farms and gotten involved in a theft or robbery." Thereafter, however, defense counsel returned to his earlier theme, stating that the officers of the 7D Vice Unit as a group "know so much that they know that no White guy has ever committed a robbery in Barry Farms."

mindset of Officer Shumac. And it gives you the mindset of the prosecution in this case. It's based on assumptions. It['s] based on assumptions that if you see two White guys jumping out of a car, you're going to know that they're police, even though they don't tell you, they're police.

Counsel concluded his argument by insisting that the only crime Bates committed was to have "two joints of marijuana ... in his pocket as he ran from two guys that looked like thugs that were chasing after him with a gun, who he thought were trying to rob him." Bates, he said, "lives in a bad neighborhood, and I'm sorry for that, maybe the Government says, he shouldn't live over there."

In rebuttal, counsel for the government was moved to respond to defense counsel's rhetoric as follows:

Ladies and gentlemen, I submit to you, you were not presented with a defense or a defense theory in this case, you were presented with a hoax. Hoax number one. [Defense counsel] stood up here and had the gall to tell us about his daughter ... and him being a good father and her pulling sticks of butter out of the refrigerator.[11] Well, you know what, ladies and gentlemen, my aunt and *my entire family who lives in Southeast on Elmira Street*, my aunt who raised me, she believes in personal responsibility, ladies and gentlemen. You know what she used to say to me when I was growing up and I spilled a glass of milk, she'd say, don't come to me. You made your mess and you clean it up. Ladies and gentlemen, Mr. Bates and Mr. Clayborne made their mess and in that trunk right there.

Well, why did [defense counsel] say this to you, ladies and gentlemen? Why did he say these things?

He stood up here, him, *you look at him and you look at me, you tell me, who the heck is he to make a statement like that. ["]Maybe the Government— maybe the Government thinks that people shouldn't live over there in places like that.["] Look at him and look at me, and who in the heck is he to say something like that in this courtroom.* But why does he do it, ladies and gentlemen? Desperation, clear and simple.

\* \* \*

And I submit to you that that statement, that he made on—I'm not evidence, ladies and gentlemen, I'm not a witness in this case, I don't testify, but that statement he made about me, that's desperation, and it's an attempt to distract you from what's sitting at this table, ladies and gentlemen, overwhelming evidence, and I'm just talking about Mr. Bates now. I'm going to get to Mr. Clayborne in a second. Overwhelming evidence of his client's guilt. *Hoax number one, [defense counsel]'s own racism.*

(Emphasis added.)

At this juncture Bates' counsel moved for a mistrial. The trial court agreed that the prosecutor's rebuttal comments were improper and were not justified by the arguments of defense counsel.[12] The court declined to grant a mistrial, however. Instead the court instructed the jury to disregard the prosecutor's last remark:

Ladies and gentlemen, the last remark is stricken from the record. In the Court's view it has no place, and that there should be no further *ad hominem*

---

11. This was a reference to an anecdote which defense counsel had offered in his argument to illustrate how people tell lies by weaving together fact and fiction.

12. The prosecutor explained that in referring to defense counsel's "racism," he meant that

the defense argument was racist, not that counsel himself was a racist. The trial court responded that "[i]t didn't come out that way," and that, in any event, calling the defense argument racist was inappropriate too.

attacks or references to counsel by either side....

> When I say stricken, it means it's not in the record. It should not be a part of your consideration in any way. Neither [the prosecutor] nor [defense counsel] are on trial here. That's not the issue.

The prosecutor's rebuttal continued without further objection.

After the trial court delivered its final jury instructions, Bates' counsel renewed his motion for a mistrial. Counsel argued that jurors with doubts about the strength of the government's case would be hesitant to "side with" someone whom the prosecutor had identified as a racist. However, the trial court continued to disagree that a mistrial was required. The court reasoned that the improper remarks were "quite removed" from the issues of guilt or innocence, that the court had acted swiftly to admonish the jury to disregard the remarks, and that the case itself did not involve a "race crime" or have "strong racial overtones." For these reasons, the court expressed confidence that the jury would ignore the prosecutor's *ad hominem* attack on defense counsel and decide the case on the evidence.

### B. Discussion

 In reviewing alleged impropriety in the prosecutor's closing argument, we first consider whether the challenged comments were improper. If they were, "then we must, viewing the remarks in context, consider the gravity of the impropriety, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *Freeman v. United States*, 689 A.2d 575, 584 (D.C.1997) (citations and internal quotation marks omitted). If the claim is properly preserved, the test on appeal is whether the appellant suffered "substantial prejudice." That is, we will reverse unless we can say with confidence that the jury verdict was not "substantially swayed" by the error. *Id.* (citations omit-

ted); *see also Irick v. United States*, 565 A.2d 26, 32 (D.C.1989).

 The challenged comments in this case were not proper:

> The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence. Conversely, it must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response ... rather than the logical analysis of the evidence in light of the applicable law.

*Dixon v. United States*, 565 A.2d 72, 77 (D.C.1989) (quoting *Bertolotti v. State*, 476 So.2d 130, 134 (Fla.1985)). A trial is not a referendum on the conduct of the attorneys, and disparagement of opposing counsel is improper. *See United States v. Young*, 470 U.S. 1, 7, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *see also Sherer v. United States*, 470 A.2d 732, 742 (D.C.1983); *Irick*, 565 A.2d at 34. Appeals based on racial identity or other attributes of counsel are not remotely permissible. *See, e.g., United States v. Richardson*, 333 U.S.App. D.C. 178, 186, 161 F.3d 728, 736 (1998).

The prosecutor in this case violated these principles in his rebuttal argument. Inviting the jury to "look at him [defense counsel] and ... look at me"—an obvious reference to racial difference—and representing that "my entire family ... lives in Southeast on Elmira Street" were improper appeals to evaluate the defense challenge to the government's case on the basis of counsel's race and background rather than the merits. Charging defense counsel with "racism" was an egregious *ad hominem* attack.

 The government argues that the prosecutor's errant comments were provoked by improper argument on the part of Bates' counsel. We agree that

> counsel on both sides of the table share a duty to confine arguments to the jury within proper bounds.... Defense counsel, like the prosecutor, must refrain

from interjecting personal beliefs into the presentation of his case. Defense counsel, like his adversary, must not be permitted to make unfounded and inflammatory attacks on the opposing advocate.

*Young,* 470 U.S. at 8–9, 105 S.Ct. 1038 (citations omitted). Defense counsel also has the same obligation as the prosecutor not to "misstate the evidence or mislead the jury as to the inferences it may draw," and to refrain from "arguments calculated to inflame the passions or prejudices of the jury." *Id.* at 9 n. 7, 105 S.Ct. 1038 (quoting ABA Standards for Criminal Justice 4–7.8 (2d ed.1980)). In this case, although Bates' defense called upon the jury to discount the testimony of the police officers, his counsel's denunciations of police "lying," "perjury" and "corruption" were objectionable. "It is for the jury, not for counsel, to decide whether a witness is telling the truth. An attorney may not divert the jurors from this task by injecting his personal evaluation as to a witness' veracity." *Powell v. United States,* 455 A.2d 405, 408 (D.C.1982). Charging "the government" with "corruption" for presenting the police testimony was likewise improper. Nor can we condone defense counsel's assertions that according to Officer Shumac or the 7D Vice Unit, "White people have never committed a robbery in Barry Farms." That was a distortion of Officer Shumac's testimony, apparently for the purpose of portraying him and the other police officers who testified as racially biased. Defense counsel's statements accusing the government of believing that "[e]verybody in Barry Farms is ... intimately involved with criminal activity," and of hostility to Bates because he lived in Barry Farms, were also illegitimate appeals to passion and prejudice.

 The lapses of defense counsel did not excuse the prosecutor's inappropriate rebuttal comments. The correct response to improper argument by defense counsel would have been to object and request curative instructions from the court. This court has emphasized

> that two wrongs do not make a right, and that it is appropriate for the judge to control improper defense tactics by corrective instructions or by an admonition to the "errant advocate," rather than by allowing the adversary to respond in kind.... [A]lthough conduct by a defense attorney which the judge deems incompatible with notions of civility and gentility may make subsequent improprieties by the prosecutor more understandable, it cannot justify them.

*Irick,* 565 A.2d at 34 n. 19; *see also Young,* 470 U.S. at 13, 105 S.Ct. 1038. In cases where either defense counsel or the prosecutor—or both—overstep the boundaries of proper argument, the trial judge should take responsibility for maintaining control. *See id.* at 10, 105 S.Ct. 1038. "Swift and stern corrective action" by the trial judge is appropriate and may eliminate any prejudice to the defendant. *Thomas v. United States,* 619 A.2d 20, 25 (D.C.1992), *reaffirmed,* 650 A.2d 183 (D.C.1994) (en banc); *see also McGriff v. United States,* 705 A.2d 282, 289 (D.C.1997).

 ·Having found the rebuttal comments improper, we next consider whether they substantially prejudiced Bates. Like the trial court, we do not discount the gravity of the prosecutor's references to race and racism. But the trial court took prompt remedial action, and its instruction to the jury that such remarks had no place in their deliberations was forceful and clear. The court emphasized the seriousness of that instruction by sternly admonishing the prosecutor in front of the jury not to indulge in another *ad hominem* attack. While curative instructions cannot be counted on to eradicate the harm in every case, *see Powell,* 455 A.2d at 411, the trial court's considered assessment of the situation is entitled to our respect. *See Lee v. United States,* 562 A.2d 1202, 1204 (D.C.1989) (trial judge "had the advantage of being present not

**510**

only when the alleged misconduct occurred, but throughout the trial").

In view of the other factors which the trial court weighed, we are satisfied that its discretionary decision not to grant a mistrial was correct. The improper comments here were not directed to the central issues of Bates' guilt or innocence. Moreover, the evidence of Bates' guilt on the drug-related charges was overwhelming and unrefuted. The government's witnesses testified without contradiction that Bates placed a paper bag containing cocaine and marijuana in the trunk of a parked car; that the paper bag and the trunk contained large quantities of drugs and drug paraphernalia indicative of possession for distribution rather than personal use; that Bates threw away bags of crack cocaine as he ran from the police; and that Bates had marijuana cigarettes and bags of crack cocaine secreted on his person at the time of his arrest. The record of the trial is devoid of evidence to support Bates' contention that the witnesses were lying about all of this.

Given the strength of the government's case, the essentially peripheral nature of the improper comments by the prosecutor, and the effective curative instruction given by the trial court, we are confident that the jury did not rest its verdict on the prosecutor's remarks.[13] We therefore conclude that Bates did not suffer substantial prejudice, and that the trial court exercised its discretion appropriately in denying Bates' motion for a mistrial.

*Affirmed.*

---

**13.** The jury acquitted Bates not only of the weapon-related charges, but also of the charge of possession of marijuana with intent to distribute. "This reinforces our conclusion that the prosecutor's remarks did not undermine the jury's ability to view the evidence independently and fairly." *Young,* 470 U.S. at 18 n. 15, 105 S.Ct. 1038.